325 F.2d 804
 James M. PENNINGTON, Raymond E. Phillips and Lillian Goad
Phillips, Admrx. of the Estate of Burse Phillips,
deceased Cross-Plaintiffs-Appellees,
v.
UNITED MINE WORKERS OF AMERICA, Cross-Defendant-Appellant.
John L. LEWIS, Henry G. Schmidt and Josephine Roche, as
Trustees of the UnitedMine Workers of America Welfare and
Retirement Fund, Plaintiffs-Appellees,James M. PENNINGTON,
Raymond E. Phillips and Lillian Goad Phillips, Admrx. ofthe
Estate ofBurse Phillips, deceased, Defendants-Appellants.
 Nos. 14809, 14810.
 United States Court of Appeals Sixth Circuit.
 Dec. 18, 1963.
 
 Harrison Combs, Washington, D.C., and R. R. Kramer, Knoxville, Tenn., E. H. Rayson, Knoxville, Tenn., M. E. Boiarsky, Charleston, W. Va., on brief, for cross-defendant-appellant.
 Harold H. Bacon, Washington, D.C., and R. R. Kramer, Knoxville, Tenn., Val. J. Mitch, Washington D.C., E. H. Rayson, Knoxville, Tenn., M. E. Boiarsky, Charleston, W. Va., on brief, for plaintiffs-appellees.
 Claude K. Robertson, Knoxville, Tenn., John A. Rowntree, Fowler, Rowntree & Fowler, Jerome Templeton, Taylor & Templeton, Knoxville, Tenn., on brief, for James M. Pennington et al.
 Guy Farmer, Washington, D.C., on brief, amicus cuaiae for Bituminous Coal Operators' Ass'n.
 David E. Feller, Elliot Bredhoff, Jerry D. Anker, Michael H. Gottesman, Washington, D.C., on brief, amici curiae for Industrial Union Department, AFL-CIO and United Steelworkers of America.
 Before CECIL, Chief Judge, MILLER, Circuit Judge, and FREEMAN, district judge.
 SHACKELFORD MILLER, Jr., Circuit Judge.
 
 
 1
 This is an action by John L. Lewis, Henry G. Schmidt and Josephine Roche, as Trustees of the United Mine Workers of America Welfare and Retirement Fund, hereinafter referred to as Trustees against the defendants, James M. Pennington, Raymond E. Phillips, and Burse Phillips, individually and trading as Phillips Brothers Coal Company, a partnership, hereinafter referred to as Phillips. The trustees seek to recover $55,982.62 as royalty payments alleged to be due and unpaid pursuant to the terms of a trust provision contained in a wage agreement between United Mine Workers of America, hereinafter referred to as UMW or the Union, and Phillips. Following the death of the defendant Burse Phillips, Lillian Goad Phillips, Administratrix of his estate, was substituted as a party defendant.
 
 
 2
 The complaint alleges that on or about October 1, 1953, Phillips and the Union entered into the National Bituminous Coal Wage Agreement of 1950, as amended September 29, 1952, hereinafter referred to as the Wage Agreement, and at specified dates thereafter entered into said Wage Agreement, as amended September 1, 1955, and as amended October 1, 1956, and that pursuant to the terms of said Wage Agreement, as amended, Phillips was required to pay into the Welfare Fund and sum of 40 cents per ton on each ton of coal produced for use or sale. The parties have stipulated the amount of tonnage of coal so produced during the period of October 1, 1953, through December 31, 1958, which was subject to the 40 cents per ton royalty, that Phillips made royalty payments thereon pursuant to the Wage Agreements in the total amount of $2,227.70, and that the amount of royalty which was not paid on said total production was $55,982.62, being the amount sued for.
 
 
 3
 There is no contention by the defendants that the Wage Agreements were not executed by the partnership, but it is contended by them that they were invalid and that no liability exists for the unpaid royalties.
 
 
 4
 The answer alleges that the agreements were entered into by Phillips by reason of duress on the part of UMW, which conducted a program of terrorism in the section in which Phillips' mine was located, with the result that the agreements were unwillingly executed because Phillips knew that they would not be permitted to operate their coal mine unless said agreements were signed.
 
 
 5
 The answer further alleges that UMW and certain large producers of coal entered into a conspiracy, the purpose of which was to place financial burdens upon Phillips and other small operators similarly situated that could not possibly be paid out of funds realized from the operation of the mine, and such mines, thus being unable to meet the demands, would be closed down, either through violence or suits such as the present one, leaving the business of shipping coal in interstate commerce and to the government agencies to the large coal operators; that UMW and the large coal companies conspired to increase such financial burdens by increasing the wage scale, both by modifications of the Wage Agreement and by having the Walsh-Healey Act apply to the coal industry and have the minimum wage determined thereunder; and that such conspiracy and the acts thereunder were in violation of Sections 1 and 2 of the Sherman Anti-Trust Act, Sections 1 and 2, Title 15 United States Code.
 
 
 6
 Section 1 of the Sherman Act provides in part:
 
 
 7
 'Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: * * *.'
 
 Section 2 of the Act provides in part:
 
 8
 'Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine * * *.'
 
 
 9
 This same alleged conspiracy is the basis of a cross claim against UMW, in which the large coal producing companies were not made cross defendants, which also alleged that during the time the Wage Agreements were in effect and for the purpose of fulfilling the conspiracy, UMW forcibly closed down Phillips' mining operation and forcibly kept the mine closed over a period of time, which was accomplished by the presence of armed mobs comprised of members or agents of UMW, which intermittently marched through the countryside, closing numerous mines on their forays and creating a reign of terror.
 
 
 10
 The cross claim alleges that by reason of the conspiracy and the enforced closing down of the mine, Phillips was damaged in the amount of $100,000.00, which should be tripled under the provisions of Section 4 of the Clayton Act, Section 15, Title 15 United States Code.
 
 
 11
 By an amended answer and cross claim Phillips alleges that in contrast to the disputes which existed between the large coal-producing companies of the country and UMW during the period of World War II and the postwar period, there has been no dispute of any consequence between these parties since 1950, that the alleged conspiracy commenced in 1950, and that it has been implemented by additional understandings between the parties to make more effective the activities in restraint of trade. It specifically alleges that the Union agreed to the termination of employment for thousands of its members because of the mechanization of mines, that it would not protest the closing down of mines which could not be mechanized and that it would go along with the understanding that the coal industry would be confined to a comparatively few companies and the miners employed would be reduced drastically; that as a consequence of this understanding, membership of the United Mine Workers has decreased from 500,000 to 150,000; that the Union agreed that it would not make special agreements with the small operators in the Kentucky and Tennessee region, which would give consideration to local conditions and the particular coal seams mined by the operators, but would have a standard agreement for all operators; that the Union agreed that in the planned mechanization program it would aid in the financing which would become necessary to attain the mechanization of the mines of the large companies; that the large coal-producing companies agreed with the Union that they would not protest the demands of the Union with respect to wage increases so long as the companies were able to match those increases by increased productivity through mechanization; that the companies agreed that there would be no protests from them over the Union's use of the Welfare Fund for its own purposes and in furtherance of its organizing efforts; that under the 1958 Wage Agreement it was required that all signatory operators refrain from buying or marketing nonunion coal; and that the Union and the large companies agreed that they would do all things possible to restrain the production, marketing and sale of nonunion coal.
 
 
 12
 By another amended cross claim Phillips claims damages for the period commencing four years prior to the filing of the original cross claim on February 14, 1958, the period of damage to end December 31, 1958, at which time the cross plaintiffs ceased to do business, as limited by the four-year limitation provided by Section 15b, Title 15 United States Code.
 
 
 13
 UMW moved to dismiss the cross claim on the ground that it stated no cause of action, that in so far as it alleged an unfair labor practice on the part of the Union under the provisions of Section 158(b), Title 29 United States Code, exclusive jurisdiction thereof was vested in the National Labor Relations Board, and that it stated no cause of action under the Sherman Anti-Trust Act or under Section 301 of the Taft-Hartley Act, Section 185, Title 29 United States Code. The motion was overruled, except in so far as it challenged the jurisdiction of the District Court over any alleged unfair labor practice under Section 158(b), Title 29 United States Code, which ground of the motion was upheld by the Court.
 
 
 14
 Thereafter, UMW filed its answer in which it denies that it joined in any conspiracy in restraint of trade or commerce in violation of the Sherman Act, or that it monopolized or attempted to monopolize or conspire with any other person or group of persons to monopolize any part of the trade or commerce among the several states. Affirmatively, it alleges that by virtue of Section 6 of the Clayton Act, Section 17, Title 15 United States Code, it is exempt from the provisions of Sections 1 and 2 of the Sherman Act. It contends that it is a labor organization within the meaning of Section 6 of the Clayton Act and it acted as such for its members in the negotiations for the execution of the Wage Agreements and that during the period of time involved herein its acts were motivated by legitimate labor goals and for the purpose of securing union standards of wages and better conditions of employment for its members, thus qualifying for the exemption provided by the Act.
 
 
 15
 The claim of the Trustees against Phillips and Phillips' cross claim against the Union were consolidated for trial by jury. Following a trial of some four and one-half weeks the case was submitted to the jury.
 
 
 16
 As an aid to the jury in reaching its verdict, the Court prepared two verdict forms for the jury to answer.
 
 
 17
 Form No. 1 contained one paragraph reading as follows:
 
 
 18
 'Did the Trustees engage in a combination or conspiracy so as to unreasonably restrain trade or commerce among the several states as alleged by the original defendant, Phillips Brothers Coal Company.'
 
 
 19
 The jury answered this question yes.
 
 
 20
 Form No. 2 contained three paragraphs. The first paragraph read as follows:
 
 
 21
 'Did the cross defendant, UMW, engage in a combination or conspiracy so as to unreasonably restrain trade or monopolize or attempt to monopolize commerce among the several states outside and beyond the exemption created by the anti-trust statutes to a labor organization as alleged by cross plaintifs, Phillips Brothers Coal Company.'
 
 
 22
 The jury answered this question yes. The jury was instructed that if its answer to this first question was no, the remaining two questions need not be answered, but that if its answer to this first question was yes, it should answer the remaining two questions.
 
 The second question read as follows:
 
 23
 'If your answer to question 1 is yes, was cross plaintiff, Phillips Brothers Coal Company, damaged in its business or property as a direct and proximate result of the conspiracy.'
 
 
 24
 The jury was instructed that if its answer to this second question was no, it need not answer question 3. The jury answered the second question yes.
 
 
 25
 The third question for the jury to answer read as follows:
 
 
 26
 'We find in favor of cross plaintiff, Phillips Brothers Coal Company, and fix its damages in the amount of dollars.'The jury in answering this question fixed the damages in the amount of $90,000.00.
 
 
 27
 At the close of the evidence for Phillips, the Trustees and the Union moved for directed verdicts in their favor, which motions were overruled. At the close of all the evidence, the Trustees and the Union moved for judgment in their favor notwithstanding the verdict and, in the alternative, that the verdict be set aside and that a new trial be granted.
 
 
 28
 The District Judge ruled that there was no material or substantial evidence to support the finding of the jury that the Trustees of the Welfare Fund, as distinguished from the Union, engaged in a combination or conspiracy to unreasonably restrain trade or monopolize or attempt to monopolize commerce among the several states and ordered that the verdict of the jury in so finding be set aside. However, in entering judgment for the Trustees, he reduced the amount of the recovery from $55,982.62 to $43,424.22, ruling that the Trustees were entitled to royalties only for the period from and after April 25, 1955, to and including December 31, 1958, in that the employees of Phillips were not members of the Union until April 25, 1955. The Trustees have not appealed from this judgment, which eliminated the earlier part of their claim. Phillips has appealed from the judgment against it, which is appeal No. 14810, being one of the two appeals being herein considered.
 
 
 29
 The District Judge overruled the motion of the Union for judgment notwithstanding the verdict and, in the alternative, for a new trial, and entered judgment for Phillips against the Union in the amount of $270,000.00, being three times the amount of damages awarded by the jury, and also included in the judgment the additional sum of $55,000.00 as a reasonable amount of attorneys' fees to be awarded and assessed in accordance with the applicable statutes, thus making a total award in the favor of Phillips in the amount of $325,000.00. The Union has taken an appeal from this judgment, which is No. 14809, being the other of the two appeals herein being considered. The two appeals have been heard together on a joint appendix.
 
 
 30
 We consider first appeal No. 14809 taken by UMW from the judgment against it in favor of Phillips.
 
 
 31
 The first question presented is whether a labor organization is exempt from the provisions of the anti-trust laws under Section 6 of the Clayton Act, Section 17, Title 15 United States Code. It provides as follows:
 
 
 32
 'The labor of a human being is not a commodity or article of commerce. Nothing contained in the anti-trust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws.'
 
 
 33
 Although some question about this may have existed prior to 1945, the Supreme Court held in that year that although an exemption exists in cases where a labor union acts alone in furtherance of its own purposes, it does not exist in cases where a labor union combines with a nonlabor organization to restrain competition in, or to monopolize the marketing of, goods in interstate commerce. Allen Bradley Co. v. Local Union No. 3, etc., 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939. See also: United Brotherhood of Carpenters, etc. v. United States, 330 U.S. 395, 400, 67 S.Ct. 775, 91 L.Ed. 973; Los Angeles Meat & Provision Drivers Union v. United States, 371 U.S. 94, 99-101, 83 S.Ct. 162, 9 L.Ed.2d 150. The District Judge was not in error in refusing to dismiss the cross claim or to direct a verdict for the Union on this ground, and in submitting to the jury under a proper instruction the question whether the Union acted alone in carrying out the legitimate objects of labor unions, or aided, cooperated, conspired or combined with business groups in order to accomplish purposes which the anti-trust laws prohibit.
 
 
 34
 There is evidence to the effect that UMW forcibly closed down Phillips' mine by the presence of armed mobs which intermittently marched through the countryside. Reference is made to recent decisions of this Court holding that under certain conditions damages caused by such illegal action are recoverable by the injured party. United Mine Workers of America v. Meadow Creek Coal Co., 263 F.2d 52, C.A.6th, cert. denied, 359 U.S. 1013, 79 S.Ct. 1149, 3 L.Ed.2d 1038; United Mine Workers of America v. Osborne Mining Co., 279 F.2d 716, C.A.6th, cert. denied, 364 U.S. 881, 81 S.Ct. 169, 5 L.Ed.2d 103; Gilchrist v. United Mine Workers of America, 290 F.2d 36, C.A.6th, cert. denied, 368 U.S. 875, 82 S.Ct. 120, 7 L.Ed.2d 76; Flame Coal Co. v. United Mine Workers of America, 303 F.2d 39, C.A.6th, cert. denied,371 U.S. 891, 83 S.Ct. 186, 9 L.Ed.2d 125. However, the Union is correct in its contention that these cases are not applicable to the present action against it. Those actions were not brought under the anti-trust laws. Although a cause of action may exist for such damage under the common law or the Taft-Hartley Act, it does not follow that a cause of action also exists under Sections 1 and 2 of the Sherman Anti-Trust law where a combination or conspiracy in restraint of trade or an attempt to monopolize trade or commerce among the states must be shown. Ace Beer Distributors, Inc. v. Kohn, Inc., 318 F.2d 283, 286, C.A.6th. The District Judge correctly charged the jury on this issue in stating to it that the activities of labor unions, which are not violative of the Sherman Act, do not become violations of the Sherman Act even if such activities are carried out by violent means, and that acts of violence in and of themselves are not material to the determination of the question of whether the anti-trust laws were violated. However, it was not error for the jury to consider such evidence as bearing on the overall issue of whether such acts were done as part of a conspiracy to restrain competition or create a monopoly. Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311; Allen Bradley Co. v. Local Union No. 3, etc., supra, 325 U.S. 797, 809-811, 65 S.Ct. 1533, 89 L.Ed. 1939.
 
 
 35
 It must also be kept in mind in considering this appeal that we are not concerned with any alleged violation of the Taft-Hartley Act, which, as the District Judge correctly held in ruling on the Union's motion to dismiss the cross claim, is a matter within the exclusive jurisdiction of the National Labor Relations Board. San Diego Building Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775. We think that the Union's rights were fully protected in this respect by the charge to the jury that the Taft-Hartley Act is not one of the anti-trust laws, that the jury was not concerned with awarding damages for any violation of the Taft-Hartley Act, that it must consider simply whether there had been a violation of the anti-trust laws, not the Taft-Hartley Act, causing damage to Phillips, and that even if there was a violation of the Taft-Hartley Act, it would not on that account be a violation of the anti-trust laws.
 
 
 36
 The Union's main contention on this appeal is that the evidence was insufficient to take the case to the jury on the allegations of the cross claim that it conspired with certain large coal producing companies to restrain trade in the bituminous coal industry among the several states or to monopolize the trade in such industry among the several states, and that it was error for the District Judge to overrule its motions for a directed verdict and for judgment notwithstanding the verdict.
 
 
 37
 The evidence in these cases is voluminous. It appears that many of the basic facts are not in dispute, although there is strong disagreement between the parties about the inferences or conclusions to be drawn from these facts. A review of the evidence in detail would unduly lengthen this opinion. We think it is sufficient to discuss some of the principal factual aspects of the case, which lead us to the conclusion that, although recognizing that some factual disputes may exist, yet taking that view of the evidence, with inferences reasonably and justifiably to be drawn therefrom, most favorable to the prevailing party, there is substantial evidence in the record to justify the submission of this case to the jury and to support the verdict. Battjes v. United States, 172 F.2d 1, 5, C.A.6th; Local 175, etc. v. United States, 219 F.2d 431, 433, C.A.6th, cert. denied, 349 U.S. 917, 75 S.Ct. 606, 99 L.Ed. 1250. On this appeal we do not judge the credibility of witnesses or weigh conflicting evidence.
 
 
 38
 The Union contends that not only was there no direct evidence that it conspired with large coal companies, or with anyone, for the purpose of putting any operator out of business, but that there is the unchallenged testimony of its President and its Secretary-Treasurer that it at no time joined with or agreed with any coal operator for such purpose. But it is recognized that conspiracies are seldom capable of proof by direct testimony and it is settled that they may be inferred from the acts of the parties thereto. Circumstantial evidence of the existence of a conspiracy may be sufficiently strong to raise a factual question for the jury even though there is no direct evidence that a conspiracy existed. It is the function of the jury to observe the witnesses while testifying, to appraise their credibility, to draw inferences from the facts established, to resolve conflicts in the evidence and to reach ultimate conclusions of fact. Eastern States Retail Lumber Dealers Ass'n v. United States, 234 U.S. 600, 612, 34 S.Ct. 951, 58 L.Ed. 1490; Local 175, etc. v. United States, supra, 219 F.2d 431, 433, C.A.6th, cert. denied, 349 U.S. 917, 75 S.Ct. 606, 99 L.Ed. 1250; Loew's Inc. v. Cinema Amusements, 210 F.2d 86, 93, C.A.10th, cert. denied, 347 U.S. 976, 74 S.Ct. 787, 98 L.Ed. 1115.
 
 
 39
 In support of the basic theory of the cross claim that UMW and the major coal companies conspired to eliminate the smaller and weaker companies thus leaving the industry to the major coal companies alone, the following background was given to the jury. After World War II the economics of the Bituminous Coal Industry became unstable by reason of the fact that there was more coal being produced than the markets required; that before 1950 the major coal producers and the union were in agreement that the major problem of the industry was over-production and that the growth of smaller independent and nonunion producers was contributing to the problem; that the major companies and the Union disagreed on how the problem should be handled; that on its side the Union was contending that the answer was to cut down on the working time of the producers; that the Union urged a three-day work week; that for many months before the 1950 contract was signed the Union took the initiative on this question and directed the working time of the men in the industry; that this domination of the men in the industry was interfered with by the passage of the new Taft-Hartley Act; that the Union's efforts to maintain closed shops and to maintain a Union controlled welfare fund were challenged and in some instances were defeated in the Courts by the major coal companies; that the major coal companies were opposed to the Union's dictating the working time of the men in the industry because it cut into profits.
 
 
 40
 Phillips contends that a marked change occurred in the relations of the Union and the major coal companies in 1950 as disclosed in their bargaining relations before and after that year; that the understanding at the time of the signing of the 1950 Wage Agreement was that the major coal companies were to decide on the working time for their employees; that this was a surrender on the part of the Union of its previous policy of seeking to control the economics of the industry by controlling the working time; that the understanding was that the problem of stabilizing the economics of the industry was to be taken care of by eliminating the smaller and weaker companies, leaving the industry to the major coal companies alone.
 
 
 41
 The following history of the Wage Agreements between UMW and the coal operators show the increased financial burden placed upon the operators over the period of 1945 through 1958.
 
 
 42
 UMW and mine operators have negotiated collective bargaining agreements since UMW's beginning in 1890 until the present time. Failure of collective bargaining purposes to function led to work stoppages and seizures and operations of the mines by the Federal Government on five occasions during 1943 through 1946. The National Bituminous Coal Wage Agreement of 1945 terminated pursuant to its terms on March 30, 1946. Collective bargaining between the Secretary of the Interior and UMW resulted in a contract increasing wages $1.85 per day, establishing a welfare and retirement fund of 5 cents per ton on all coal produced for use or for sale and continuing the nine-hour day with over-time for work in excess of seven hours per day and thirty-five hours per week.
 
 
 43
 Ensuing disputes thereafter resulted in UMW terminating the agreement, but negotiations were resumed and a new agreement was entered into effective July 1, 1947, which increased wages $1.20 a day, reduced the work day to eight hours and increased payments to the welfare fund to 10 cents per ton. Following the resignation of the Welfare Fund's neutral trustee and a disagreement of the remaining two trustees with respect to pension payments, the UMW announced that the operators had dishonored the contract and a nationwide strike began in March 1948. The President invoked Taft-Hartley's national emergency provisions, a Board of Inquiry held hearings and injunction proceedings to enjoin the strike were instituted.
 
 
 44
 A new agreement was executed on June 25, 1948, which provided for an increase of $1.00 per day in wages and raised the royalty payment to the welfare fund to 20 cents per ton.
 
 
 45
 Under the 1950 agreement, executed on March 5, 1950, wages were increased 70 cents a day, and Welfare Fund royalties were increased from 20 cents to 30 cents a ton.
 
 
 46
 The 1951 agreement effective February 1, 1951, which amended the 1950 agreement, raised wages $1.60 a day to $16.35.
 
 
 47
 The 1952 agreement, effective October 1, 1952, raised basic daily wages $1.90 to $18.25, and increased fund payments from 30 cents to 40 cents a ton.
 
 
 48
 The 1955 agreement, effective September 1, 1955, raised wages in two steps for a total of $2.00 per day to $20.25, the vacation period was lengthened two days and vacation pay increased to $40.00.
 
 
 49
 The 1956 agreement, signed October 4, 1956, provided a $2.00 a day wage increase to $22.25 on a two-step basis. Vacation pay was raised $40.00 and for 1956 only a Christmas vacation period of three days with a $40.00 payment was provided.
 
 
 50
 The 1958 agreement, effective December 1, 1958, provided a two-step $2.00 a day wage increase, which brought basic wages as of April 1, 1959, to $24.25 daily. Vacation pay was raised $20.00 to a total of $200.00 for a fourteen-day period.
 
 
 51
 The campaign to impose the wage contracts upon the smaller nonunion mines was intense after 1950. In areas of strong resistance mobs and terrorism were used. One or more of the major coal companies assisted in closing the operations of the principal union competitor of UMW in the bituminous coal labor field. We think the evidence supports the contention of Phillips that the Union knew that the weaker companies could not meet the increased costs of wages and welfare fund payments required by the successive wage agreements and that they would fall by the wayside by reason thereof, and that the increased costs in the successive agreements were geared to the abilities of the major coal companies to mechanize and not have their profits affected by the increased costs.
 
 
 52
 There was also evidence that before signing the Wage Agreement in October 1953 Phillips told the UMW representative that it was a new company just starting out and that it could not pay the wage scale or the 40 cents a ton to the Welfare Fund, and that the representative told them that they could work out their own working arrangements with their employees and pay whatever they could to the Welfare Fund. To its knowledge, no employee of the partnership belonged to the Union at that time and the Union did not represent the employees, although the Union succeeded in organizing the company later.
 
 
 53
 With respect to suits against coal operators in Tennessee for unpaid royalties, two suits were filed in 1954, no suits were filed in 1955, one suit was filed in 1956, no suits were filed in 1957, thirty-nine suits were filed in 1958, thirty-eight of which were pending as of December 1, 1960, when the tabulation was made, and seven suits were filed in 1959. It was the established policy of the Trustees to make no discounts or reductions or settlements for less than the full amount owed, irrespective of the economic condition of the operator. Many of the small operators were unable to meet the increased labor costs under the Wage Agreement and the payments to the Welfare Fund, and discontinued operations. Phillips strongly stresses the heavy increase in the litigation in 1958. The present action was filed against it on January 6, 1958.
 
 
 54
 The 1952 Wage Agreement contained a so-called 'land-lease' provision, under which the signatory operators agreed that the Wage Agreement covered the operation of all of the coal mines owned or held under lease by them or by any subsidiary or affiliate, or acquired during the term of the agreement. The evidence showed that there was a large reserve of coal lands owned or held under lease by the major coal companies. It is argued that this provision barred the small coal companies that could not pay the union wage and the royalties to the Welfare Fund from operating this land and that there was but little good coal land available to them as a result of this provision.
 
 
 55
 The 1952 Wage Agreement contained a clause which provided that the signatory operators would not buy, sell or deal in coal mined by companies that did not pay the same labor costs as contained in the Wage Agreement. The major coal companies had the practice of frequently buying coal from the smaller companies to apply on their large long-term contracts. This market was eliminated for those small companies that could not operate under the provisions of the Wage Agreement.
 
 
 56
 There was evidence showing that UMW acquired outright 85,400 shares, out of 857,264 shares outstanding, of the common stock, and the entire 50,000 shares of the preferred stock of West Kentucky Coal Company, one of the major coal companies, of which the Nashville Coal Company was a subsidiary. The common stock was acquired at a price of about $25.00 per share. Later, the stock market quotation rose to about $40.00 a share and thereafter declined to about $11.00 per share. The preferred stock was acquired at about $50.00 per share. The preferred stock became voting stock when dividends were in arrears. Arrearage dates back to April 1, 1958. On June 30, 1960, it was $309,375.00. In addition to the stock owned outright, UMW held substantial blocks of the stock of the two companies as collateral on loans. Under the provisions of many of these notes, which the collateral secured, the borrower was relieved from personal liability upon surrender of the collateral. The notes were renewed annually. If the interest was not paid, usually because dividends were not paid on the stock held as collateral, it was added to the principal of the renewal note. If the stock held as collateral declined in value, there was no demand for additional collateral. One of these loans in the amount of $2,513,895.18, secured by 90,600 shares of common stock of West Kentucky Coal Company, was to Cyrus S. Eaton, Chairman of the Board of West Kentucky Coal Company and Nashville Coal Company, as well as Chairman of the Board of Chesapeake & Ohio Railway Company, Steep Rock Iron Mines, Portsmouth Corporation, and a member of the Board of Cleveland Cliffs Iron Company, Cleveland Electric Illuminating Company, Kansas City Power & Light Company, and Sherwin Williams Company. This direct and indirect interest in the two coal companies totaled over $25,000,000.00. The shares of common stock of West Kentucky Coal Company owned outright and held as collateral totaled more than one-half of the outstanding common stock. It was not unreasonable for the jury to conclude from these facts that it was the purpose of the UMW to have a very material voice, if not the dominant one, in determining the policies and operations of these two major coal companies, which, as is hereinafter pointed out are charged with playing an important role in the alleged conspiracy.
 
 
 57
 The evidence showed the large growth of the Tennessee Valley Authority steam plants, generating electricity by steam. The use of coal by TVA increased from 500,000 tons in 1950 to approximately 20,000,000 tons in 1956. The TVA plants were designed for the use of coal only. TVA buys coal under term and spot market bids. The spot market involves small orders of coal to be delivered in a short period of time, which offers definite advantages to small companies with weak financial resources, which can thus avoid long-term commitments. About seventy-five percent of TVA coal is bought on term contracts and about twenty-five percent on spot contracts. In 1955 UMW and two of the large coal producing companies successfully sought a determination by the Secretary of Labor of a minimum wage in the coal industry under the Walsh-Healey Act. The minimum wage determined was materially higher, in most instances twice as high, than the minimum wage determined in any other industry under the Walsh-Healey Act. This minimum wage determination prevented Phillips from bidding on the TVA term market, although it left open to Phillips for the time being the TVA spot market.
 
 
 58
 We believe that the following evidence is relevant on this phase of the case. At the 1956 Convention of the Union, President John L. Lewis introduced Secretary of Labor Mitchell, who, in the course of his remarks, spoke as follows:
 
 
 59
 'I have had occasion, as Mr. Lewis has indicated, to work with your organization in the Department of Labor on many fronts. * * * As you know, about a year ago the Secretary of Labor, for the first time in history, found a minimum wage in the coal industry which controlled the wages that were to be paid to workers who worked on government contracts. We purposely sought that determination in order to exclude from government bidding those nonunion mines which are a detriment to the industry. And I think by and large we have succeeded, except for certain areas of government purchasing which still have to be, shall I say, investigated. Twenty-five per cent, at the moment of the TVA purchases are made under contracts less than $10,000.00, which excepts such purchases from the determination of the Walsh-Healey Act. I have set in motion a study of the TVA purchasing policy to see if there is any evasion of the Walsh-Healey determination on the part of TVA. I don't know whether there is or not, but if there is, you can be sure that we will correct it: . . . I propose to continue this enforcement policy, because I believe it is in the interest not only of the worker but is in the interest of the fair employer to prevent the chiseling, nonunion employer from competing in the market place with fair employers who hire union labor.'
 
 
 60
 President Lewis, responding at the end of the speech, said:
 
 
 61
 'I am sure that the Chair voices the sentiments in the mind of every delegate in expressing our appreciation of the address of the distinguished Secretary of Labor. His personal assurance of his intention to fairly treat the men of the coal industry is bulwaked and borne out by his attitude in the entire period of three and a half years of his incumbency of that office.'
 
 
 62
 Although this evidence was objected to by the Union, it was admitted by the District Judge with the cautionary admonition that the Secretary of Labor couldn't say anything that would prejudice the rights of the UMW unless the UMW authorized him to say it, or unless the UMW approved what he said, or ratified what he said, or acquiesced in what he said. We are of the opinion that this evidence was not improperly received.
 
 
 63
 Contracts for less than $10,000.00 were not subject to the wage determination of the Walsh-Healey Act. Phillips sold coal on the TVA spot market under contracts for less than $10,000.00, thus avoiding the wage determination of the Walsh-Healey Act. About the end of 1956 the price of coal on the spot market began to decline, which continued through 1957 and 1958, finally reaching a very low figure in 1958. During 1956, 1957 and 1958 Pittsburg-Midway Coal Co., Peabody Coal Co., West Kentucky Coal Co. and Nashville Coal Co., four of the large coal producing companies, made large offerings of tonnage on the TVA spot market at generally declining prices, with a number of such bids being successful. There was evidence that West Kentucky coal was sold extensively in the middle western market, most of it up and down the Mississippi Valley, that the middle western utility market had held up well, but that the distress coal which was for sale by West Kentucky Coal Co. and Nashville Coal Co. was for the most part thrown into the TVA market rather than the other market. There was also evidence that West Kentucky Coal Co., Nashville Coal Co. and Peabody Coal Co. did not make an analysis of the profit on the coal sold to TVA, the President of Peabody Coal Co. stating that he was 'afraid to look at some of them.' There was also evidence that the heavy offerings of West Kentucky coal on the TVA spot market would have the effect of bearing down on the price heavily.
 
 
 64
 We believe it was a reasonable deduction which the jury could make that the wage determination for the coal industry under the Walsh-Healey Act and the dumping of West Kentucky coal on the TVA spot market materially and adversely affected the operations of Phillips in the important TVA market, thus contributing to the elimination of the company as a competitor to the large coal producing companies operating in that area, including the West Kentucky Coal Company, in which the UMW had such a dominant interest.
 
 
 65
 On the question of damages, Phillips introduced evidence showing the total tonnage it shipped on the TVA steam market in 1956, 1957 and 1958, the average price Phillips received for this steam coal, and the national average for all kinds of coal for those years. This is shown by the following table:
 
 
 66
 Phillips Price National
Year Shipments Received Average
---- -------------- --------- --------
1956 14,128.70 tons $3.92 $4.82
1957 19,717.67 3.20 1/2 5.08
1958 25,603.03 3.13 1/3 4.86
 
 
 67
 The difference between what Phillips would have received in each of these years if it had received the national average and the amount it actually received was $12,715.83 in 1956, $37,003.49 in 1957, and $44,207.90 in 1958, or a total of $93,927.22. The jury by its verdict awarded damages in the amount of $90,000.00.
 
 
 68
 The Union challenges the sufficiency of this evidence to sustain an award of damages on the ground that the national average price of all kinds of coal does not afford a valid base of comparison with Phillips TVA coal. In particular, it contends that Phillips was a strip mine coal operator and that the national average price of all coal is substantially above the national average price of strip mine coal; that the utility market is the lowest coal market in price and may not be compared, pricewise, with the average market for all coal; that the spot market was the lowest part of the low-price utility market and that Phillips sold its coal on this lower prices spot market rather than on the higher priced term market; and that Phillips sold its premium (block and egg) coal separately from its utility coal well above the prices received for its utility coal, but did not include receipts for its premium coal in its average price which is compared with the national average price of all coals.
 
 
 69
 These factors, if unexplained or unaccounted for, could have the effect of reducing the amount of the difference between the national average of all coals and the average price which Phillips received on the TVA spot market for steam coal, but in the light of other factors involved and brought out by the evidence, as hereinafter pointed out, we do not think the comparison was so unfair as to reject its consideration by the jury in its entirety in determining what, if any, damage Phillips suffered by reason of the conspiracy, if it found such a conspiracy existed.
 
 
 70
 In this connection there was evidence that the quality of steam coal, rather than the fact that it was deep underground coal instead of strip mining coal, was the important factor in the price; that the national average for high volatile bituminous coal was 12,900 BTU per pound, that the average for Tennessee high volatile bituminous coal was 13,460 BTU per pound; that Campbell County, Tennessee, coal, in which county Phillips operated, had an average of 13,200 BTU; and that there was a guaranteed minimum of 13,215 BTU per pound in the Phillips coal offered on a dry basis.
 
 
 71
 There was also evidence that the market for steam coal was not restricted to the utilities but included industrial concerns and railroads, and that the higher priced coal sold at retail had fallen from 20 per cent of the total in 1940 to 8 per cent in 1958. Although the fact was a disputed one, there was evidence to the effect that the difference between the national average price for all bituminous coal and the price received by Phillips for steam coal was not materially affected by the fact that the national average price was for all bituminous coal, including so-called premium coal, and that the coal sold by Phillips on the TVA market did not include premium coal.
 
 
 72
 It is true that damages which are speculative cannot be recovered. But that does not mean that when damages have resulted from a wrongful act, they cannot be recovered because they are uncertain in amount or because the injured party cannot show with certainty the exact amount of damage incurred. It is enough if the evidence shows the extent of the damage as a matter of just and reasonable inference, although the result be only approximate. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544. We are of the opinion that the evidence in the present case brought the case within that rule. The District Judge instructed the jury at length upon the question of damages. In our opinion, the rights of the Union on the question of damages were fully protected.
 
 
 73
 UMW contends that the District Judge erred in admitting evidence with reference to the Walsh-Healey prevailing wage determination and having TVA comply therewith, and in charging the jury concerning UMW's efforts to obtain Walsh-Healey prevailing wage determinations and to have TVA enforce such wages. It relies upon Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464. It was held in that case that no violation of the Sherman Act can be predicated upon mere attempts to influence the passage or enforcement of laws, and that the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or monopoly.
 
 
 74
 With respect to the Walsh-Healey Act, the District Judge charged the jury:
 
 
 75
 'Any approach to the Secretary of Labor, which was designed to raise the minimum wages to be paid by coal operators doing business with the TVA or other governmental agencies, was not a violation of the antitrust laws. Therefore, you will not give any consideration whatever to this approach to or meeting with the Secretary of Labor, unless you find that the approach to the Secretary of Labor was a part of the conspiracy to get the prevailing wages establish in the coal industry so high as to drive the small operators out of business.'
 
 
 76
 UMW contends that although the first part of this instruction was in accordance with the ruling in the Noerr case, it was error to qualify the instruction by the concluding words, 'unless you find. * * *'
 
 
 77
 The District Judge also instructed the jury that it was no violation of the antitrust law for the Union or the coal operators to urge the TVA to abide by the spirit and letter of the Walsh-Healey Act or to modify its methods of buying coal, 'unless the parties so urged the TVA to modify its policies in buying coal for the purpose of driving the small operators out of business.' The qualifying words in this instruction are likewise complained of.
 
 
 78
 We do not construe the Noerr ruling as creating an unlimited exemption to Sections 1 and 2 of the Sherman Anti-Trust Act. We believe that the Noerr ruling had reference to conduct which in good faith looked to the enforcement of the law or a modification of an existing policy, unaccompanied by a purpose or intent to further a conspiracy to violate a statute. It is the illegal purpose or intent inherent in the conduct which vitiates the conduct which would otherwise be legal. We find no error in the two instructions complained of.
 
 
 79
 Complaint is also made of the admission in evidence by the District Judge of statements of George Love, an alleged co-conspirator, before a prima facie case of the alleged conspiracy was presented. In doing so, the District Judge told the jury, 'before these statements are competent as evidence and binding upon any alleged co-conspirator, the jury will have to find that there was a conspiracy and that such statements were made in furtherance of the conspiracy.' We find no error in admitting the statements before presenting a prima facie case of the alleged conspiracy, provided that the admission in evidence is conditional upon such proof of the conspiracy being later introduced, as the jury was instructed in this case. The District Judge has a wide discretion in controlling the order of proof. United States v. Manton, 107 F.2d 834, 844, C.A.2nd, cert. denied, 309 U.S. 664, 60 S.Ct. 590, 84 L.Ed. 1012; Flintkote Company v. Lysfjord, 246 F.2d 368, 378, C.A.9th, cert. denied, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46. We find no merit in the contention that without the statements of Mr. Love, the evidence was insufficient to support the allegation that a conspiracy existed.
 
 
 80
 Accordingly, the judgment in case No. 14809 is affirmed.
 
 CASE NO. 14810
 
 81
 In this case the jury found that the Trustees of the Welfare Fund engaged in a combination or conspiracy so as to unreasonably restrain trade or commerce among the several states. The District Judge was of the opinion that there was no substantial evidence to support the verdict, set aside the verdict, and entered judgment for the Trustees notwithstanding the verdict, although in a reduced amount from that asserted by the Trustees.
 
 
 82
 On this appeal Phillips contends that the verdict is supported by evidence from which it could reasonably be concluded that (1) the Trustees paid benefits only to members of UMW: (2) the Trustees required the beneficiaries of the trust to picket or perform other acts for the UMW in order to obtain or retain pension benefits, or acquiesced in the doing of these things by the beneficiaries; (3) the Trustees, as a punitive measure, brought legal actions to recover royalties on coal produced; (4) the Trustees held out to the men in the industry that the Fund was under union control; and (5) the Fund, in fact, was under the domination and control of the UMW.
 
 
 83
 In setting aside the verdict the District Judge expressed the opinion that the action of a majority of the Trustees was required to bind the Fund (see Van Horn v. Lewis, 79 F.Supp. 541, D.C.D.C.); that the action of John L. Lewis, President of UMW, alone, without authorization or consent of the majority of the Trustees, was not sufficient to show that the Trustees conspired with the large coal operators to drive a small operator out of business, and that there was no evidence to support the finding that Mr. Lewis, for himself and another of the Trustees, entered into the alleged conspiracy.
 
 
 84
 We are of the opinion that the District Judge was not in error in setting aside the verdict and entering judgment for the Trustees notwithstanding the verdict. We find no direct evidence that the Trustees participated in the alleged conspiracy, and the inferences which Phillips would have us draw are not justifiable or reasonable in the light of the strong and uncontradicted testimony of the Trustees themselves. We concur in the opinion of the District Judge in his analysis of the evidence on this aspect of the case, to which was rfer.
 
 
 85
 Since the District Judge ruled that the evidence was not sufficient to sustain the verdict that the Trustees engaged in a conspiracy to unreasonably restrain interstate commerce in violation of the Sherman Act, it was not necessary for him to rule upon Phillips' contention that such a violation of the Sherman Act, if it had occurred, was a bar to the right of the Trustees to recover in this action. However, should it be that that ruling and our concurrence in it is not the correct one, we are nevertheless of the opinion that, contrary to the contentions of Phillips, the verdict of the jury was not a bar to the right of the Trustees to collect the royalty payments which had accrued under the contract on the coal already mined. Kelly v. Kosuga, 358 U.S. 516, 79 S.Ct. 429, 2 L.Ed.2d 475; Connolly v. Union Sewer Pipe Co., 184 U.S. 540, 549, 22 S.Ct. 431, 46 L.Ed. 479; D. R. Wilder Mfg. Co. v. Corn Products Refining Co., 236 U.S. 165, 35 S.Ct. 398, 59 L.Ed. 520.
 
 
 86
 Phillips also attacks the validity of the contract under which the Trustees are seeking a recovery on two other grounds. (1) It is contended that UMW had not performed the statutory requirements necessary to be performed before a valid union security clause could be inserted in the contract between it and Phillips, and since the contract contained such a union security clause, it rendered the contract invalid. (2) It is contended that since the evidence shows that the contract was forced upon Phillips through threats and violence and Phillips' employees were in like manner forced to join the Union in order to make it possible for Phillips to operate its mines, this constituted an unfair labor practice on the part of the Union under the Labor Management Relations Act, Sections 157 and 158(b), Title 29 United States Code, which, in turn, rendered the contract void in its entirety.
 
 
 87
 We doubt that these issues are before us on this appeal. They were not submitted to the jury and no facts were found by the jury with respect thereto. On the contrary, the District Judge instructed the jury:
 
 
 88
 'The sole question for you to decide in the suit of the Trustees is whether the plaintiff Trustees engaged in a combination or conspiracy so as to unreasonably restrain trade or to monopolize commerce among the several states as alleged by Phillips Brothers.'
 
 
 89
 Twice thereafter in his charge, the District Judge repeated the substance of this instruction to the jury. Following the instructions and a consideration of the UMW's objections to the charge, counsel for Phillips stated to the Court:
 
 
 90
 'If your Honor please, the defendants and cross-plaintiffs have no exceptions to the charge and no requests for additional charges.'
 
 
 91
 Lively v. Elkhorn Coal Co., 206 F.2d 396, 399, C.A.6th. Nevertheless, we will briefly answer these two contentions.
 
 
 92
 The first contention is rejected on the authority of N.L.R.B. v. Rockaway News Supply Co., 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832, and Lewis v. Benedict Coal Corporation, 361 U.S. 459, 468-470, 80 S.Ct. 489, 4 L.Ed.2d 442
 
 
 93
 In support of the second contention, Phillips relies upon International Ladies' Garment Workers' Union v. N.L.R.B., 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762. In that case the employer entered into a collective bargaining agreement with a union which represented only a minority of the employees. The Labor Board found that both the employer and the union were guilty of an unfair labor practice, ordered the employer to cease and desist from giving effect to the collective bargaining agreement, and directed the holding of representation election. The Court of Appeals granted enforcement of the order. The Supreme Colurt affirmed. In doing so, it said:
 
 
 94
 'On the facts shown, the agreement must fail in its entirety. It was obtained under the erroneous claim of majority representation.'
 
 
 95
 We think that statement must be construed in the light of the circumstances under which it was made. The Court did not have before it the question of the validity of the contract in a common law action to enforce it. The issue which it was passing upon was whether the execution of the contract constituted an unfair laobr practice, and, if so, what was the proper remedy. The remedy was to direct the parties to cease and desist from operating under it. Because of the unfair labor practices the agreement failed to be binding on the parties. The same might be true of the bargaining agreement in this case if this was a proceeding before the Labor Board involving an alleged unfair labor practice. But it is not that kind of a proceeding, over which the Labor Board was exclusive jurisdiction. Protland Web Pressmen's Union v. Oregonian Publishing Co., 286 F.2d 4, C.A.9th, cert. denied, 366 U.S. 912, 81 S.Ct. 1086, 6 L.Ed.2d 237. Neither the District Court nor this Court has jurisdiction to find either of the parties to the bargaining agreement guilty of an unfair labor practice, and no such finding has been made. In the absence of such a proceeding and finding, we are of the opinion that the ruling in International Ladies' Garment Workers' Union v. N.L.R.B., supra, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762, is not applicable.
 
 
 96
 In any event, with respect to the coal already mined and the rights accrued thereby, we are of the opinion that the Trustees' right to recover is not barred. Lewis v. Benedict Coal Corporation, supra, 361 U.S. 459, 80 S.Ct. 489, 4 L.Ed.2d 442; Kelly v. Kosuga, supra, 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475.
 
 
 97
 The judgment in case No. 14810 is affirmed.