SOUTH–EAST COAL COMPANY,
Plaintiff-Appellee,

v.

CONSOLIDATION COAL COMPANY,
Defendant-Appellant.

SOUTH–EAST COAL COMPANY,
Plaintiff-Appellee,

v.

UNITED MINE WORKERS OF AMER-
ICA, Defendant-Appellant.

Nos. 19622, 19623.

United States Court of Appeals,
Sixth Circuit.

Nov. 18, 1970.

Harold R. Schmidt, Pittsburgh, Pa., for Consolidation Coal Co.; Anthony J. Polito, Rose, Schmidt & Dixon, Pittsburgh, Pa., Amos H. Eblen, Eblen, Howard & Milner, Lexington, Ky., on brief.

Edward L. Carey, Washington, D. C., for United Mine Workers of America; Harrison Combs, Willard P. Owens, Washington, D. C., H. B. Noble, Hazard, Ky., E. H. Rayson, Knoxville, Tenn., M. E. Boiarsky, Charleston, W. Va., on brief.

John A. Rowntree, Knoxville, Tenn., for appellee; C. Gibson Downing, Stoll, Keenon & Park, Lexington, Ky., Fowler, Rowntree, Fowler & Robertson, Knoxville, Tenn., on brief.

Before PHILLIPS, Chief Judge, and CELEBREZZE and BROOKS, Circuit Judges.

BROOKS, Circuit Judge.

These are appeals by defendants-appellants, United Mine Workers of America (UMW or Union) and Consolidation Coal Company (Consol or Consolidation),[1] from a jury verdict imposing civil liability for alleged violation of Sections 1 and 2 of the Sherman Anti-Trust Act (15 U.S.C. §§ 1 and 2). Plaintiff, South-East Coal Company (South-East), contended that a conspiracy to restrain trade existed between UMW, Consol and other large coal companies and the Bituminous Coal Operators Association (BCOA) which was designed to force South-East and other small coal producers in Eastern Kentucky out of the bituminous coal business. After a trial lasting six weeks, the jury returned a verdict for plaintiff, South-East Coal Company, in the amount of $2,410,452. This amount was tripled ($7,231,356) as required by 15 U.S.C. § 15, and attorneys' fees of $335,000 were allowed, bringing the total judgment to $7,566,356. We affirm.

On numerous occasions this Court has considered similar alleged conspiracies between the UMW and large bituminous coal producers and for a general explanation and description of the nature of the contended conspiracy in this case, the following cases are particularly illuminating. United Mine Workers of America v. Pennington, 381 U.S. 657 at 664, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); Tennessee Consolidated Coal Company v. United Mine Workers, 416 F.2d 1192 at 1193 (6th Cir. 1969); Ramsey v. United Mine Workers, 265 F.Supp. 388 at 392, 393 (E.D.Tenn.1967); Pennington v. United Mine Workers, 325 F.2d 804 at 806, 807 (6th Cir. 1963).

While recognizing that the present case is factually distinguishable from these cited cases[2] and that differing proof was employed by the plaintiff, South-East, in attempting to establish the existence of this conspiracy, this opinion would, however, be unduly lengthened by an elaborate discussion of plaintiff's case and proof. Therefore, the specific and unique facts involved in this case which bear on issues raised on this appeal will be considered in conjunction with those issues. Both appellants have taken issue with certain conduct at trial which allegedly prejudice. them jointly, and these issues will be consolidated for consideration. Issues

---

1. In this action, unlike the situation which existed in Ramsey v. United Mine Workers of America, 416 F.2d 655 (6th Cir. 1969), a coal company which allegedly conspired with the Union to restrain trade was made a codefendant.

2. A notable difference is that, unlike in the cases cited above, there is in the present case no contention made that the alleged conspiracy attempted to affect or manipulate coal prices in the T.V.A. bituminous coal market.

raised by appellants which explore alleged errors having only singular significance will be dealt with individually.

## I. ALLEGED ERRORS IN INSTRUCTIONS

### A. The Standard of Proof Required to Impose Liability

Consol and the Union argue that the District Court erred in its charge to the jury on the necessary degree or standard of proof which plaintiff must meet in order for the jury to conclude that appellants violated the Sherman Act. The Union, relying upon Lewis v. Pennington, 400 F.2d 806 (6th Cir. 1968)[3] and Ramsey v. United Mine Works of America, 416 F.2d 655 (6th Cir. 1969),[4] contends that the District Court did not adequately or accurately instruct the jury that to impose liability on the Union every essential element of the violation, except damages, must be established by "clear proof".[5] Consol joins in and

3. The Lewis v. Pennington case has a rather involved history. This Court first affirmed the District Court holding against UMW in Pennington v. UMW, 325 F.2d 804 (6th Cir. 1963). The Supreme Court agreed that the Union's exemption from the antitrust laws did not apply in this situation but reversed on other grounds. UMW v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). On retrial in Lewis v. Pennington, 257 F.Supp. 815 (1966), the District Court found in favor of the Union reasoning that plaintiff failed to demonstrate by "clear proof" any violation of the antitrust-laws. This Court in Lewis v. Pennington, 400 F.2d 806 (6th Cir. 1968) affirmed the District Court. (Before Judges Edwards, Peck and Combs, per J. Edwards). Certiorari was denied by the Supreme Court in 393 U.S. 983, 89 S.Ct. 450, 21 L.Ed.2d 444 (1968).

4. In Ramsey v. UMW this Court sat en banc. This was an appeal from the District Court ruling dismissing the action, 265 F.Supp. 388 (1967), because plaintiffs could not show an antitrust violation on the part of the Union by "clear proof", although by the ordinary standard of preponderance of the evidence the Court suggested that liability might be imposed upon the Union. A three-judge panel of this Court heard this appeal on April 8, 1969. Rehearing en banc was granted and that opinion appears at 416 F.2d 655 (6th Cir. 1969), Chief Judge Phillips and Judges Edwards, Peck and Combs for affirming; opinion by Judge Edwards. Judges Weick, O'Sullivan, Celebrezze and McCree for reversing; opinion by Judge O'Sullivan. Certiorari was granted by the Supreme Court, 397 U.S. 1006, 90 S.Ct. 1238, 25 L.Ed.2d 419 (1970).

One week before the en banc hearing in Ramsey, a panel composed of Judges Weick, Peck and Combs (opinion by Judge Weick) in Tennessee Consolidated Coal Company v. UMW, 416 F.2d 1192 (1969) affirmed the jury finding of liability of the union for an antitrust violation. (The West Kentucky Coal Company which was joined as a defendant because it was an alleged coconspirator of the union was voluntarily non-suited. Thus, here again we had only the union being sued.) This Court observed regarding the District Court's instructions that the Union was given the benefit of a more stringent standard of proof by the fashion in which the District Court instructed the jury on "clear proof" and, therefore, was not prejudiced by the instructions even if they were incorrect. The Court made the following remark respecting Section 6 of the Norris-LaGuardia Act: "Section 6 does provide that participation, authorization or ratification must be shown by clear proof. Section 6 does not state that the unlawful acts must be shown by clear proof." Judges Peck and Combs were among the judges in the divided court in Ramsey, supra, which there held that all elements of the antitrust violation except damages must be shown by clear proof. Judge Weick, author of the opinion in Tennessee Consolidated Coal, joined those judges in Ramsey who felt that only the authorization, participation or ratification by the Union of the unlawful acts need be shown by clear proof. Certiorari in Tennessee Consolidated Coal was denied by the Supreme Court, 397 U.S. 964, 90 S.Ct. 999, 25 L.Ed.2d 256 (1970).

5. The District Court gave an instruction on proof by a preponderance of the evidence, see infra p. 778. However, in its supplemental instructions to the jury, the Court gave the following charge on "clear proof":

"Members of the jury, the Court has already charged you that the issue of alleged conspiracy in this case must be decided upon clear proof, that is, the plaintiff must produce clear proof of the alleged conspiracy. Clear proof means

maintains that it too should get the benefit of this more stringent standard of proof. This Circuit is somewhat in disagreement as to the proper degree of proof required to hold a labor union liable for violating the Sherman Act. In the en banc hearing in Ramsey v. United Mine Workers, *supra*, the Court divided evenly on the issue. Four judges held that to impose liability on a labor union for a Sherman Act violation Section 6 of the Norris-LaGuardia Act [6] requires that every element of the unlawful act except damages be shown by "clear proof". Four judges construed this section of the Norris-LaGuardia Act to provide that the "clear proof" standard applied only in proving that the Union participated in, authorized or ratified the unlawful acts of its officers with actual knowledge. They concluded that after this was shown by "clear proof" the remaining elements of the antitrust violation—formation of the antitrust conspiracy, the unlawful acts, causation and damages, and all the other elements—required proof only by a preponderance of the evidence.

■ Because a major coal company has been named a defendant as a coconspirator with the UMW in this antitrust case, a unique problem is presented with respect to the standard of proof question. That problem is what standard of proof must be met by the plaintiff to hold a company liable for an antitrust violation if it conspired with a labor union. If it is assumed that the correct standard of proof to be applied in holding a labor union civilly liable for a Sherman Act violation is "clear proof" of all essential elements, the question then is: "Should a company which is fortuitously joined as a coconspirator of a labor union in an antitrust case get the benefit of the stricter standard of proof afforded the union?" There is no basis in either the Sherman Act or the Norris-LaGuardia Act to indicate that to impose liability on a company, named as a coconspirator of a labor union for an antitrust violation, anything more than a preponderance of the evidence is necessary. To hold that a company should get the benefit of this more strict standard, simply because it was named with a labor union as a coconspirator in a scheme to restrain trade, would be to grant such a company a more advantageous position than other companies would have, which might violate the antitrust laws but are not joined with a union. The law does not provide such an arbitrary advantage. The standard of proof applicable to a company in attempting to show it violated the antitrust laws, regardless of whether it is joined as a coconspirator with a labor union, is the preponderance of the evidence. Bigelow v. RKO Radio Pictures, 150 F.2d 877, 883 (7th Cir. 1945); reversed on other grounds, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946).

■ Having concluded that the standard of proof needed to be met to hold a company civilly liable for an antitrust

---

clear, unequivocal, and convincing proof that the defendants participated in, actually authorized the alleged conspiracy or ratified it after having actual knowledge thereof. I want to give you that *additional instruction as a definition for one of the terms I used in my charge.*" Thus, the District Court did charge the jury that "clear proof" of participation, authorization or ratification of the alleged conspiracy by the defendants was necessary to hold them liable. While it is concluded that the "clear proof" standard is applicable only in holding a union ratified or authorized the acts of its officials, the District Court's instruction even if erroneous gave both defendants the benefit of a more stringent burden of proof for finding them liable.

6. Section 6 of the Act (29 U.S.C. § 106) provides:

"No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof."

violation is preponderance of the evidence, another legal hurdle is encountered when, as in this case, a company is joined as a coconspirator with a union. Again, assume that the correct standard of proof applicable to a labor union under these circumstances is "clear proof." Hypothetically, a situation could exist where only a union and a single company have conspired to restrain trade. Suppose that in this hypothetical case it could be shown by a preponderance of the evidence that the company did conspire to violate the antitrust laws, however, while a preponderance of the evidence also showed the union conspired, it could not be shown by "clear proof." Therefore, the union would be exonerated and, by force of the fact that a Sherman Act violation is an actionable wrong only when committed under an unlawful conspiracy by two or more, the company would also escape liability. United States v. Socony-Vacuum Oil Company, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); Standard Oil Company of California v. Moore, 251 F.2d 188 (9th Cir. 1957), cert. denied, 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148. Thus, the company by indirect method would have received the benefit of the more strict standard of proof. While the chances of a situation as this occurring are perhaps remote, this explains the type of problem which may result when parties to an actionable wrong like conspiracy have their respective ultimate liabilities gauged by different standards of proof.

■■ This leads to the question of whether all essential elements of an alleged antitrust conspiracy against a labor union must be shown by "clear proof." The en banc decision of this Court in *Ramsey* did not resolve this controversy. Without a repetitive discussion of the rationale behind this panel's conclusion on this issue, already extensively explored in Judge O'Sullivan's opinion in *Ramsey*, it is concluded that while "clear proof" is necessary to show that the Union participated, authorized, or ratified the acts of its officers, the essential elements of the conspiracy necessary to resolve the ultimate issue of liability need be shown only by a preponderance of the evidence. (See n. 4). The jury charge on the standard of proof issue could have been more clear, however, the parties were given the benefit of a partial instruction which was more stringent than required by this Court's conclusion on what is the proper standard of proof.[7] Thus, the parties were not prejudiced by the instruction even if it was erroneous.

### B. The Reasonableness of the Restraint

■ UMW and Consol claim they were prejudiced by the absence of an instruction to the jury that only undue or unreasonable restraints of trade or competition are grounds for finding a Sherman Act violation. Usually, to find that a violation of the Sherman Act has occurred, the restraint of trade or competition resulting from certain acts committed by the accused parties must be "unreasonable." See generally, Standard Oil Company of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); Apex Hosiery Company v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940); Lewis v. Pennington, *supra*. However, there are several types of restraints of trade which are per se unreasonable. See e. g., United States v. Trenton Potteries Company, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927); United States v. Socony-Vacuum Oil Company, Inc., *supra*; United States v. Consolidated Laundries Corporation, 291 F.2d 563 (2nd Cir. 1961). Other restraints, while reasonable on their face, become unreasonable when they are accompanied with a specific intent to accomplish a forbidden restraint. United States v. Columbia Steel Company, 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948).

In United Mine Workers of America v. Pennington, *supra*, an alleged conspiracy existed which had as part of its purpose the identical objective that plaintiff,

7. See n. 5, supra.

South-East, contends was the object of this particular conspiracy. That is, that the "union entered into a conspiracy with the large operators to impose the agreed-upon wages and royalty scales upon the smaller, non-union operators, regardless of their ability to pay and regardless of whether or not the union represented the employees of these companies, all for the purpose of eliminating them from the industry, limiting production and pre-empting the market for the large unionized operators." Respecting this type of conspiracy the Supreme Court observed at 381 U.S. 665, 666, 85 S.Ct. 1591:

"[A] union may make wage agreements with a multi-employer bargaining unit and may in pursuance of its own union interests seek to obtain the same terms from other employers. No case under the antitrust laws could be made out on evidence limited to such union behavior (Footnote omitted). But we think a union forfeits its exemption from the antitrust laws when it is clearly shown that it has agreed with one set of employers to impose a certain wage scale on other bargaining units. One group of employers may not conspire to eliminate competitors from the industry and the union is liable with the employers if it becomes a party to the conspiracy."

The Supreme Court then made the following analogy:

"One could hardly contend, for example, that one group of employers could lawfully demand that the union impose on other employers wages that were significantly higher than those paid by the requesting employers, or a system of computing wages that, because of differences in methods of production, would be more costly to one set of employers than to another. The anticompetitive potential of such a combination is obvious, but is little more severe than what is alleged to have been the purpose and effect of the conspiracy in this case to establish

wages at a level that marginal producers could not pay so that they would be driven from the industry." 381 U.S. at 668, 85 S.Ct. at 1592.

■■ The conclusion which can be drawn from this language is that when a labor union and an employer enter into a plan or scheme of the type which results in the union losing its exemption from liability under the antitrust law, that plan or scheme is by definition an unreasonable restraint under the antitrust laws. [But see the interpretation given this language by Judge Peck in Lewis v. Pennington, 400 F.2d 806, 813–814 (1968) and by District Judge Wilson in Ramsey v. United Mine Workers, 265 F.Supp. 388, 399 (1967)]. Thus, if it could be shown that in this case the Union entered into a conspiracy with certain large coal operators to impose agreed upon wages and royalties upon smaller, non-union coal producers, regardless of their ability to pay and regardless of whether or not the Union represented the employees of these smaller companies, all for the avowed purpose of eliminating them from the business, limiting production and pre-empting the market for the larger, unionized coal producers, this conspiracy would be a per se unreasonable restraint of trade or competition. While the District Court did not give an instruction that only undue or unreasonable restraints of trade or competition can be grounds for a jury to conclude that there was an antitrust violation, in light of the conclusion that if the alleged conspiracy in this case was proved, it would be by definition unreasonable, no specific instruction on the reasonableness of the restraint was necessary.

C. Instructions on a Labor Union's Exemption from the Antitrust Laws

■ The United Mine Workers argue that they were prejudiced by the District Court's failure to give its proffered instruction on a labor union's exemption from the antitrust laws.[8] The District

8. The Union proffered the following instruction:

"3. In Section 6 of the Clayton Act, which amended the Sherman Antitrust

Court gave the following instructions respecting activities of a labor union and their relationship to the antitrust laws:

"Now, the law does not make it unlawful for them to combine for the purpose of making a union for the purpose of protecting their rights and for having a bargaining agent, so you are not to consider because the union is composed of a great many miners, all of the miners in this Eastern Kentucky who are members of it, that of itself is not unlawful. The courts have expressly said so.

"The law has expressly said so in what is known as the LaGuardia Act that was passed by the Congress. That is not unlawful."

\* \* \* \* \* \*

"Then under the national law and under the national policy, the labor laws, as we have produced under what is known as the Labor Act, and the LaGuardia Act and these other Acts of Congress, they were allowed to bargain collectively. They didn't hire one man for so much and another for so much, but the miners and other workers in other industries were allowed to bargain collectively and to select a bargaining agent."

\* \* \* \* \* \*

"A union may make wage agreements with a multi-employer bargaining unit and may, in pursuance of its own union's interest, seek to obtain the same terms from other employers; but a union forfeits its exemption from the anti-trust laws when it is clearly shown that it has an agreement with one set of employers to impose a wage scale on the bargaining unit." [9]

"One group of employers may not conspire to eliminate competitors from the industry, and the union is liable with the employers if it becomes a party to the conspiracy.

"This is true even though the union's part in the scheme is an undertaking to secure the same wages, hours, or other conditions of employment for the remaining employees and employer in the industry.

"It is a legitimate aim of any national labor organization to obtain uniformity of labor standards, and it may be a consequence of such union activity to eliminate competition based on difference in such standards.

"This, however, does not mean that the union and the employers in one bargaining unit are free to bargain about wages, hours, and working conditions of other bargaining units or to attempt to settle these matters for the entire industry.

"The union has a duty to bargain unit by unit in order to best serve its obligations to its members.

"The Union should retain the ability to respond to each bargaining situation as the individual circumstances

Act, Congress declared 'that the labor of a human being is not a commodity or article of commerce nor shall (labor) organizations or the members thereof be held or construed to be illegal combinations or conspiracies in restraint of trade under the antitrust laws.' The entering into a wage agreement with employers, which is a successful union activity, may have some influence on price competition by eliminating that part of such competition which is based on differences in labor standards. However, a labor union to be effective must eliminate the competition from goods produced under sub-standard labor conditions. The elimination of price competition based on differences in labor standards is a lawful union objective and the effect of such objective on price competition is not violative of the antitrust laws. Apex Hosiery Co. v. Leader, 310 U.S. 469, 503 [60 S.Ct. 982, 84 L.Ed. 1311]; UMWA v. Pennington, 381 U.S. 657, 664 [85 S.Ct. 1585, 14 L.Ed.2d 626]."

9. The correct statement per *Pennington* is "a certain wage scale on other bargaining units." Apparently, this was a misspoken phrase, as the District Judge in the remainder of the charge more than adequately conveys the idea that the disallowed conduct is when an employer (or a multi-employer bargaining unit) combines with a labor union to impose certain labor standards or conditions on other bargaining units or employers.

might warrant without being straight-jacketed by some prior agreement with favored employers."

These instructions, portions of which are taken from UMW v. Pennington, 381 U.S. 657, 185 S.Ct. 1585, 14 L.Ed.2d 626 (1965), adequately explained to the jury what types of conduct a labor union may engage in without fear of antitrust violation repercussion. The instructions also advised the jury under what circumstances otherwise lawful union activity would result in an antitrust violation. See generally, Allen Bradley Company v. Local Union No. 3, International Brotherhood of Electrical Workers, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945); United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941); Ramsey v. United Mine Workers, *supra.* The Union complains that the expression "exemption" was only used once in the instruction. It is interesting to observe that even in UMW's proffered instruction on this subject (see n. 8) the expression "exemption" was not used. While a party has the right to have his legal claims of defenses stated to the jury by way of instructions, so long as the District Judge accurately states these claims or defenses, there can be no grounds for *objection* simply because the exact wording or phrasing of the requesting party are not used.

The Union contends that the instructions in this case were as fatal as those given in Cedar Crest Hats, Inc. v. United Hatters, Cap and Millinery Workers International Union, 362 F.2d 322 (5th Cir. 1966). That suit involved a labor union against whom charges of antitrust violations and unfair labor practices were made. On appeal the union objected to the court's instructions which did not even mention that certain conduct engaged in by a labor union does not fall within the scope of activities violating the antitrust laws. A comparison of the trial court's instruction in that case (appearing at 362 F.2d 322, 325–326) with the instructions given in the instant case, *supra,* respecting a labor union's conduct in regard to the antitrust laws clearly indicates that the instructions in question on this appeal were both correct and fair.

### D. Equal Hypothesis Rule

Appellants contend it was error for the District Court not to instruct the jury that "where proven facts give equal support to each of two inconsistent inferences; in which event, neither of them being established, judgment, as a matter of law, must go against the party upon whom rests the necessity of sustaining one of these inferences as against the other, before he is entitled to recover." Pennsylvania Railroad Company v. Chamberlain, 288 U.S. 333, 339, 53 S.Ct. 391, 393, 77 L.Ed. 819 (1933). It is argued that such an instruction is a necessary component of the law applicable to circumstantial evidence and was properly given in Ramsey v. United Mine Workers, 265 F.Supp. 388 at 432 (1967), and Tennessee Consolidated Coal Company v. United Mine Workers (unreported District Court opinion) and respectively affirmed by this Court in Ramsey v. United Mine Workers, 416 F. 2d 655, 665 (6th Cir. 1969), and Tennessee Consolidated Coal Company v. United Mine Workers, 416 F.2d 1192, 1202–1203 (6th Cir. 1969).

It appears that the "equal hypothesis rule" is simply a negative way of phrasing the rule of law that a plaintiff must sustain his burden of proof. Thus, if a plaintiff does not come forth with evidence, when considered in light of opposing evidence, from which a jury could infer the truth of an alleged proposition over its contra-proposition, the plaintiff has not met his burden of proof. When there are equal inferences which can be drawn from a particular set of facts—one inference indicating liability, the other non-liability—it is the judge's obligation at the direct verdict stage of the trial to find for the defendant. See Pennsylvania Railroad Company v. Chamberlain, *supra*; Gulf Refining Company v. Mark C. Walker & Son Company, 124 F.2d 420, 426 (6th Cir. 1942). It would not be proper un-

der these circumstances for the trial judge to relinquish to the jury this responsibility by simply giving them an instruction to the effect that if they could not draw either an inference of liability or one of nonliability from the facts presented, they should conclude nonliability.[10]

 In this case the District Court instructed the jury on the meaning of plaintiff having to sustain the burden of proof by a preponderance of the evidence. He stated:

"Now, in order to recover, the South-East Coal Company must sustain the burden of proof; in other words, if no proof was offered, there would be no judgment for the plaintiff. It is his responsibility to offer proof to establish the facts that he claims.

"And the defendant has the right, as you have seen here, to offer proof to contradict those facts or to explain those facts or to justify its conduct, which may have been brought out by witnesses for the plaintiff in support of its allegations.

"But it is the responsibility of the plaintiff to sustain this burden of proof. Now, by 'burden of proof,' it doesn't necessarily mean the greater number of witnesses. Sometimes the burden of proof in lawsuits can be sustained by one witness as contrary to fifteen on the other side, and so you are not to confuse the idea of 'burden of proof' with numbers of witnesses or numbers of depositions or other articles of evidence that might be offered.

"But it must convince you, before this plaintiff may recover, it must sustain its burden of proof by proving every essential element of the claim, by a preponderance of the evidence.

"Should it fail in its proof, under this rule you should find for the defendant.

"To establish the preponderance of the evidence means to prove that something is more likely so than not so; in other words, the 'preponderance of the evidence' means such evidence, when considered and compared with that opposed to it, has more convincing force and produces in your minds belief that what is sought to be proved is more likely to be true than not true."

These instructions explained what South-East had to prove and to what degree the jury must be convinced of the truth of South-East's assertions. It was not error for the District Court to refuse to give the "equal hypothesis" instruction requested by appellants.

E. Instructions Respecting the Use to be Made by the Jury of Certain Hearsay Statements

 Consolidation raises as error the District Court's refusal to give a concluding instruction to the jury regarding the permissive use of certain statements which were competent evidence as against the Union but were hearsay as applied to Consolidation. The rejected instruction stated in part that:

"During the trial the Court has permitted the introduction of evidence concerning the actions and statements of each of the defendants with specific admonition to the jury, however, that the members of the jury must not consider that evidence against the other

---

10. The *Ramsey* case relied upon by appellants was a non-jury case. On appeal an observation—not an instruction—made by the District Judge in his opinion was quoted with approval. Since the "equal inference" rule or doctrine is used by the trial judge in deciding the question of whether a directed verdict should be granted a defendant because plaintiff has not satisfied his burden of proof, it is both logical and correct that this rule entered the trial judge's thinking in the non-jury trial in *Ramsey*. It is doubtful that the equal inference instruction given in *Tennessee Consolidated* to the jury was correct. However, this apparently was not assigned as error on appeal as no mention whatsoever is made of that instruction or the propriety of its use in the appellate opinion in the case. See Tennessee Consolidated Coal Company v. United Mine Workers, 416 F.2d 1192 (6th Cir. 1969).

defendants * * *. Inasmuch as there can be no liability on the part of the defendants unless a conspiracy is (proven) * * * you must disregard all of such evidence unless you first find by other and disassociated evidence in the case sufficient * * * proof that the conspiracy claimed by plaintiff existed. In such event you may then consider the evidence subject to the admonition in concert with all the other evidence in the case."

A requested instruction similar to this was not given in Schmeller v. United States, 143 F.2d 544, 550 (6th Cir. 1944), and it was held reversible error. This case lends the strongest support for Consolidation's position. However, since the *Schmeller* case was decided, the logic and correctness of a jury charge that instructs that certain hearsay statements as to one defendant cannot be used by the jury in determining whether a conspiracy exists between defendants until the jury has first concluded that the defendants are guilty of an unlawful conspiracy, has apparently been seriously challenged. In addition, appellants' reliance on *Schmeller* is not entirely appropriate as part of the reason the Court found error in the refusal to give the instruction was that there were both substantive charges and a conspiracy charge involved. In the instant case we are dealing only with a conspiracy charge. In Carbo v. United States, 314 F.2d 718, 736 (9th Cir. 1963), an instruction almost identical to that offered by Consolidation in this case was held to have been properly rejected as not a correct statement of the law. The Court in *Carbo* observed:

"The situation is rendered confusing by the fact that the admissibility of this evidence (concededly relevant but challenged under a technical evidentiary rule of competence) depends upon a disputed preliminary question of fact which coincides with the ultimate jury question upon the merits. (Footnote omitted). The declarations are admissible against the defendants if they are co-conspirators. If they are co-

conspirators they are guilty. The problem presented to us is whether the preliminary question (upon the resolution of which only independent evidence is available) is to be resolved by the jury or by the judge. Appellants' view of the law [which, except for the standard of proof is identical to that asserted by Consolidation] * * * is that the preliminary question is to be resolved by the jury upon proof beyond a reasonable doubt.

"Yet if by independent evidence the defendant's position as a co-conspirator is to be established by the jury upon their judgment beyond a reasonable doubt, there is no occasion ever to resort to the declaration at all. The district court in effect will have told the jury, 'You may not consider this evidence unless you first find the defendant guilty.'" [Bracketed explanation is this Court's].

While *Carbo* and many of the cases which have dealt with this problem are criminal in nature, therefore requiring the jury to conclude the existence of a conspiracy beyond a reasonable doubt, the paradox of instructing a jury that certain statements can be used to establish a conspiracy only after they have already found the conspiracy to exist is just as illogical in civil cases, although a lesser standard of proof is required. Thus, it is concluded that the preliminary question of the admissibility of evidence challenged under this technical evidentiary rule (this is clearly a question of admissibility and not of sufficiency or weight of the evidence, Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1962)) is a matter for the judge not the jury to decide and, therefore, the instruction was properly rejected by the District Court. We deal here only with the propriety, as a legal matter, of the District Court's refusal to give Consolidation's proposed instruction, and the question of whether the Court erred in admitting these statements because no prima facie case was established will be considered later, *infra*, see p. 788.

F. Instructions Respecting the Protective Wage Clause and "80-Cent Clause" in the National Agreement

Alleged errors in the District Court's instruction regarding the Protective Wage Clause (PWC) [11] and the "80-cent clause" [12] presents a legal problem the resolution of which may be helped by a brief discussion of the clauses and the role they played in the various national labor agreements in which they appeared. The National Bituminous Coal Wage Agreement entered into between the Bituminous Coal Operators Association (BCOA) and the United Mine Workers in 1950 was amended in 1958 thereby incorporating the Protective Wage Clause. The arrangement provided by the clause was that the United Mine Workers agreed, as bargaining agent for the employees covered by the contract (members of the UMW), that while the contract was in effect it would not enter into, or be a party to any agreement covering wages or working conditions which were not on an equal basis with those provisions contained in this contract. In re-

turn for this commitment, the coal producing signatories to the National Agreement (BCOA members) agreed "that all bituminous coal mined, produced, or prepared by them, or any of them, or procured or acquired by them or any of them under a subcontract arrangement shall be or shall have been mined or produced under terms and conditions which are as favorable to the employees as those provided for in this contract."

The "80-cent clause" of 1964 amended the Welfare and Retirement Fund provisions of the 1950 National Agreement. The Protective Wage Clause was dropped from the Agreement in that year. Until this amendment went into effect signatories to the National Agreement had to pay into the Welfare Fund forty cents per ton of coal they produced. The purpose of the amendment was to obligate signatories who procured or acquired bituminous coal for sale or use which was not produced under an agreement requiring the paying of forty cents per ton into the Welfare Fund (non-UMW produced coal) to pay eighty cents into the Wel-

11. See Ramsey v. United Mine Workers, 416 F.2d 655 and Tennessee Consolidated Coal Company v. United Mine Workers, 416 F.2d 1192 for a discussion of the PWC and the complete text of the clause.

12. The "80-cent clause" of the National Agreement provided:
"UNITED MINE WORKERS OF AMERICA WELFARE AND RETIREMENT FUND OF 1950
(As Amended)
"Amend the first printed paragraph of subsection A of this clause by striking out all of the second sentence beginning with the word 'During' and ending after the word 'sale' and inserting in lieu thereof the following: 'During the life of this agreement there shall be paid into such Fund by each operator signatory hereto the sum of forty cents (40 cents) per ton of two thousand (2,000) pounds on each ton of bituminous coal produced by such Operator for use or for sale. On all bituminous coal procured or acquired by any signatory Operator for use or for sale, (i. e., all bituminous coal other than that produced by such signatory Operator) there shall, during the life of this agreement, be paid into such Fund by each such Operator signa-

tory hereto or by any subsidiary or affiliate of such Operator signatory hereto the sum of (80 cents) per ton of two thousand (2,000) pounds on each ton of such bituminous coal so procured or acquired on which the aforesaid sum of forty cents (40 cents) per ton had not been paid into said Fund prior to such procurement or acquisition. The parties hereto mutually agree that, if at any time during the term of this agreement a court or tribunal of competent jurisdiction determines by final decision that the provision appearing in the sentence just preceding, providing for the payment by signatory Operators of eighty cents (80 cents) per ton under certain prescribed conditions, is invalid or in violation of the National Labor Relations Act, as amended, or other federal or state law, the parties shall, at the option of and upon demand by party of the second part, without affecting the integrity of any other provision of this section or any other provision of the National Bituminous Coal Wage Agreement, meet and engage in good faith negotiations to agree upon a clause to be inserted into this agreement in replacement of the provisions found invalid or unlawful.' "

fare Fund for each ton of coal so procured. While the stated purpose of the amendment was to protect work standards by equalizing labor costs between employees of signatories and non-signatories, the obvious effect was to discourage signatories from purchasing or acting as sale agents for coal companies which produced coal with non-UMW laborers.

The legality of the Protective Wage Clause, in terms of the antitrust laws, was considered in the *Ramsey* and *Tennessee Consolidated Coal* cases. In *Ramsey*, responding to the allegation that the PWC was a per se violation of the Sherman Act, the Court (all judges concurred in this portion of the opinion) observed that the clause was capable of two opposite constructions. However, the proper interpretation to be given the clause was the one "that does not result in a violation of the law." *Ramsey* at 659. In *Tennessee Consolidated Coal* the jury's general verdict imposing liability on the Union concluded that the PWC required the Union not to bargain with non-signatory operators except upon the terms and conditions of the National Agreement, 416 F.2d 1192, 1197 (6th Cir. 1969). The jury also found in response to special interrogatories that "prior to and apart from" the National Agreement as amended in 1958 the UMW did not conspire with signatory coal operators to impose the terms of the National Agreement on non-signatories. It should be noted that except for several minor alterations in the 1950 National Agreement made by the 1958 amendment, the addition of the Protective Wage Clause by the amendment constituted the major change in the National Agreement. On appeal in *Tennessee Coal*, this Court stated that the contract, the PWC, was ambiguous and that all circumstances surrounding the contract and the practical construction given it by the parties could be used by the jury in determining

the meaning of the contract. While it cannot be said with absolute certainty upon which theory or basis the jury chose to impose liability in the *Tennessee Coal* case, it seems that the jury felt that the PWC was the crux of the Union's illegal conduct.[13]

The legality of the "80-cent clause" in terms of the antitrust laws has not been considered by an appellate court. When the "80-cent clause" was incorporated into the National Agreement, charges that it violated Section 8(e) of the National Labor Relations Act were raised. See Lewis v. National Labor Relations Board, 122 U.S.App.D.C. 18, 350 F.2d 801 (1965); International Union, United Mine Workers v. National Labor Relations Board, 130 U.S.App.D.C. 244, 399 F.2d 977 (1968). A final determination of this question has not been made.

Appellants maintain that the instruction with respect to these clauses failed to "adequately or accurately" explain the significance of these provisions and the proper legal interpretation that should be given them. Specifically, they contend that the District Court's instructions were in contradiction in so far as they instructed the jury that the contracts or national agreements containing these clauses were legal, but that they, the jury, could conclude that an antitrust violation occurred if they found that the agreements were entered into with the intention of driving certain coal producers out of business. It is argued that this is paradoxical and that either the agreements were legal or illegal. South-East contends that the instructions were accurate and more than adequate because they admitted the legality of the clauses in the national agreements, but based their claim of antitrust violation on the theory of the existence of an "intentional predatory conspiracy" as developed by Mr. Justice White's opinion in *Pennington*. Neither of these positions is a

13. The *Tennessee Coal* case was decided a week after the *Ramsey* case. However, it is not clear what effect *Ramsey* has on the findings of the jury in *Tennessee Coal*. Certiorari was denied in *Tennessee Coal* but granted in *Ramsey*.

wholly correct interpretation of the law as stated in *Pennington*.

In *Ramsey* the Supreme Court's decision in *Pennington* was examined with particular attention given to what type of combination or agreement between an employer and a labor union might produce grounds for concluding that an antitrust violation occurred. It was in *Ramsey* that it was decided that "the language of the agreement (PWC) did not per se constitute an illegal conspiracy." In addition, *Pennington* was construed to have held that "a conspiracy between employers and labor formed with the intention of driving competitors out of business is a violation of the Sherman Act" and that " 'predatory intent' (as used by Mr. Justice White, 381 U.S. at 668, 85 S.Ct. 1585 * * *) is merely shorthand employed to describe this anti-competitive conspiracy."

■■ Reviewing the *Ramsey* decision's interpretation of *Pennington*, four conclusions may be drawn applicable to the present dispute. First, the National Agreement containing the Protective Wage Clause is, on its face, a valid labor contract which seeks to implement the perfectly legal goals of uniformity of wages and working conditions. Second, if this agreement was made or entered into by the union in pursuance of its own self interests, there are no grounds for concluding a violation of the antitrust laws. Third, if, however, the employers and union entered into this contract with the conscious knowledge or intent that it would be used to drive competitors out of business (more than the incidental effects caused by the adoption of a uniform wage agreement which may result in certain operators not being able to function profitably), then a violation of the antitrust laws has occurred. Fourth, it is this either expressly or impliedly agreed-upon use of the valid contract, that is, that it will be used to drive competitors out of business, that comprises the agreement or conspiracy which is illegal for purposes of the antitrust laws. Without deciding the question of the legality of the "80-cent clause"

suffice it to be said that these conclusions are also applicable to that provision.

The District Court gave the following instruction with regard to the National Agreement, the nature of an illegal conspiracy and what South-East was required to show before the jury could impose liability on the defendants:

"In order to establish a conspiracy or unlawful arrangement as claimed by the plaintiff in this case it is not necessary that the plaintiff should offer proof of a direct arrangement or executed written contract that they are entering into a conspiracy.

"It is not necessary that the agreement, if any, was the result of formal action on the part of the defendants. The real question to be determined is whether or not there was a meeting of the minds or a common understanding and purpose in the requirement of the execution of the labor agreement with the intention of doing injury to the plaintiff.

\* \* \* \* \* \*

"The thing which you will have to decide and which I will probably refer to again, there is nothing unlawful about that contract in itself; but if it was entered into with the intention on the part of the signatories—the two defendants here—to injure the plaintiff, if they had that in mind, that 'we are going to go into this contract because we know it will put South-East out of business; they can't meet the conditions; we are too big, too strong, and they cannot compete with us, cannot get miners to work for them, and they cannot sell their coal on the market because they do not have sufficient sales agency, so we will deliberately enter into this and they can't meet it; we will thereby profit by putting competitors out of business or seriously hampering his operation.'

"So, the issue is: Did these two signatories have that thing of putting the South-East Coal Company out of business in mind, the time they signed the contract?

\* \* \* \* \* \*

"You are instructed that if you believe there was an industry-wide collective bargaining agreement, whereby employers and the union agreed on the wage scale that exceeds the financial ability, of some small operators, including the plaintiff, to pay, and that the agreement was made for the purpose of forcing some employers, including the plaintiff, out of business, or injuring its business, and you believe that the defendants, the Consolidation Coal Company and the United Mine Workers, deliberately entered into and participated in such an arrangement, and that the result of such an arrangement was the sole cause of damage, if any, to the plaintiff, then you will find for the plaintiff.

"If you do not so believe, you will find for the defendants."

 It was not necessary for the District Court to go into more detail about the significance of the PWC or the "80-cent clause." [14] The charge properly instructed the jury on the relationship between the National Agreement and the antitrust laws and what must be shown in this regard to impose liability.[15]

14. During closing arguments counsel for UMW objected to certain statements made by counsel for South-East about the National Agreement. The District Court at that time gave further instructions to the jury about the PWC. The colloquy was as follows:

The Court: "As I understand counsel's argument, he is drawing a deduction from these circumstances. He does not argue, and the jury is instructed, if it has been given that impression, that it is not proper.

"There is nothing wrong per se, that is, of itself, with the execution of this contract. I should instruct them on that as a general instruction.

"In other words, you are not to consider that simply because there was an agreement between BCOA and the UMW that that of itself established a violation of the antitrust laws.

"I got the impression that he was using those figures to establish his claim that the results proved the basis on which he relied."

### G. The Defense of In Pari Delicto, Assumption of Risk of the Conspiracy, Waiver of Rights Arising from the Conspiracy and Estoppel

 Appellant Consolidation Coal claims error in the District Court's instruction on its various defenses. Particular emphasis is assigned to the alleged error in the District Court's instruction on the defense of *in pari delicto*. With reference to this defense, the District Court charged the jury that:

"Now, the defendants here say that, admitting all of these things for the sake of argument, as we put it, whatever damage came to the plaintiff, that he was a part of it.

"He can't claim anything against the coal operators because this arrangement which they had with the UMW had his approval and endorsement, that he was a member of the BCOA—Bituminous Coal Operators Association—that drew up the contract, and that he was a sponsor of it and, therefore, if he got hurt by it, if it was wrong, he was helping in a wrong, 'impari delicto' (sic) they call it. That is equal guilt.

South-East's Counsel: "The circumstances at the time of making these contracts, they have got to be used to prove an antitrust claim."

Appellants' Counsel: "I submit to the Court that the same words that were used at the bench as being objectionable were used by this counsel to the same effect, that this jury would have to consider the consequences of this type of bargaining, eliminating from the whole industry certain people and causing a good deal of harm."

The Court: "The jury is instructed that the execution of the contract itself is not per se a violation of law."

Appellants' Counsel: "Okay."

15. Appellants also claim error in the instruction because of remarks made by the District Judge which were incorrect statements of certain dates involving passage of the PWC and "80-cent clause." In the supplemental instructions the District Judge corrected himself and no prejudice resulted from the error.

"A person who is of equal guilt cannot claim that he has been wronged by other people who assisted or collaborated with him on the same project.

"The defendants have entered the defense of 'in pari delicto'—this means that the defendants say that if an unlawful conspiracy existed, plaintiff was equally responsible with defendants in the formation of said conspiracy. .

"Under this defense, the Court charges you that if the plaintiff was a co-initiator of the conspiracy and equally responsible therefor, plaintiff is not entitled to recover damages for that period of time that the plaintiff remained a party to the conspiracy.

"Now, a person may be a party to such an arrangement, be 'in pari delicto,' but he can withdraw from that. You are not once brushed with tar that you can't get rid of.

"So, even though you may believe that he did do this, that he was in this arrangement, entered into this contract for the purpose of putting other operators out of business, yet, if you believe that he withdrew from and he got out of it and if you find that the defendants were more responsible than the plaintiff for the formation of the conspiracy, plaintiff may recover, even though it was a party to the conspiracy, even though South-East Coal Company was a party to the conspiracy.

"Even though you may find that plaintiff was a party to the conspiracy and if you find that plaintiff withdrew from the conspiracy and sought to avoid the effects of the conspiracy, it may recover damages arising in the period of the case subsequent to such withdrawal."

This charge more than adequately instructed the jury with respect to the defense of *in pari delicto*, and the effect South-East's participation in the conspiracy would have on the amount of damages recoverable if termination of its part in the conspiracy did not occur. The only difficulty with the instruction is that perhaps it should not have been

given at all. Recent cases have tended to indicate that for reasons of public policy the defense of *in pari delicto* is not available to a defendant in certain types of antitrust cases. See Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L. Ed.2d 982 (1968); Gaines v. Carrollton Tobacco Board of Trade, Inc., 386 F.2d 757 (6th Cir. 1967); Sahm v. V–1 Oil Company, 402 F.2d 69 (10th Cir. 1968). However, since it has been concluded that the instructions given on this defense were correct, it is not necessary to reach the question of whether the type of antitrust conspiracy involved in this case falls into the category of those antitrust conspiracies in which the defense of *in pari delicto* is available.

■ Consolidation's request for instructions on its defenses of assumption of risk of the conspiracy, waiver of rights arising from the conspiracy and estoppel were properly rejected by the District Court. While these defenses might be proper in certain negligence and contract cases, there is no evidence that Congress intended that these defenses could be set up by analogy as a defense in an antitrust case. Furthermore, even if these defenses were available, it appears that they would be subsumed in the more inclusive defense of *in pari delicto*.

H. Instructions Dealing with the Issue of Bad Business Judgment

■ Consolidation also claims that the District Judge negated one of its primary contentions with certain remarks made in the instructions. The primary contention allegedly negated by the District Judge's statements was that much of the injury South-East sought recovery for did not result from the antitrust conspiracy but rather was caused by a "serious mistake in judgment in building a cleaning plant costing $5 million and at a point some one hundred twenty-five miles from the mine * * *" The remarks made by the District Judge concerned only in a very general fashion the importance of a cleaning apparatus

in processing bituminous coal and the expensiveness of such a device. There was copious testimony at trial on both sides of the issue of whether the building of the cleaning plant by South-East was or was not a mistake in business judgment. The alleged prejudicial statements on this matter were made at the very beginning of the charge during a general discussion of the bituminous coal industry when the meaning of certain jargonistic words and phrases used in the coal industry and at the trial were explained to the jury. Towards the end of the instructions, the Judge charged the jury on appellant's bad business judgment theory of the cause of South-East's injuries. He stated:

"The defendants take the position that the (conspiracy did not cause plaintiff's injuries) * * * (but the injuries were) the result of either mismanagement, over expansion, economic conditions, or a combination of these, with possibly other circumstances, to none of which either of these defendants had any part.

"That is the theory of the defendants here, that by building this cleaning plant at Irvine, that there was a significant miscalculation of its cost of construction, more than a million dollars it anticipated to cost; that it was 125 miles in haul from the mines to that plant, which was an additional expense and contrary to good coal production management, and that by loss of the sale of coal through no fault of Consolidation Coal Company, but through the failure of the plaintiff to exercise orthodox business acumen; that that is what caused this plaintiff to lose money, and that through its own failures and no reason to accuse either of these defendants to have committed wrongful acts; the financial problems of the plaintiff arose from its own actions and its own failure to exercise good business judgment in the face of advice on the part of Consolidation Coal Company, according to Mr. Tucker, I believe, who was the witness—is that his name?

Appellants' Counsel: "Cassidy."

The Court: "The last witness who testified. Well, anyway, one of the witnesses for the defendant that he was concerned about the building of this tipple and this cleaning plant, and advised the plaintiff, through its president, Mr. LaViers, and possibly others, that importation from Canada and other places and the use of gas and oil was going to reduce the coal demands thirty-three and a third per cent from locality, or more. Notwithstanding that, this plaintiff proceeded to its development and expansion, and that these defendants were in no way responsible for it. But, due to these circumstances alone, if he had any loss, it was caused by that."

If there was a negation of one of appellant's theories by the passing remarks made by the District Judge at the beginning of the charge to the jury, it obviously was more than compensated for by the explanation of appellant's position just quoted. It is concluded that appellants were not prejudiced by certain complained of statements made by the District Judge in his instructions to the jury.

## II. ALLEGED ERRORS IN EVIDENTIARY MATTERS

### A. Evidence of Effects and Consequences of the Alleged Antitrust Conspiracy

The appellants challenge the District Court's ruling on certain evidence offered by South-East which concerned economic conditions in the coal industry in Eastern Kentucky. The evidence was principally statistical and related to such things as: the reduction in the number of miners employed in the coal industry, diminution of population in certain coal producing areas, wage scales in the bituminous coal industry, quantitive fluctuations in coal production in various years, income and losses of certain bituminous coal producing companies. The objection raised to this type of evidence was that it inordinately emphasized alleged "effects and consequenc-

es" of the antitrust conspiracy, thereby misleading the jury to believe that the existence of an anti-competitive conspiracy or agreement could be inferred from these conditions. It is argued that this Court's decisions in Lewis v. Pennington, 400 F.2d 806 (6th Cir. 1968), and Ramsey v. United Mine Workers of America, 416 F.2d 655 (6th Cir. 1969), and the Supreme Court's decision in United Mine Workers of America v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), specifically rejected the theory that an antitrust conspiracy can be proven by effects and consequences. The argument is not clear, but it appears that objection is not made to the admissibility of this type of evidence, rather that this type of evidence standing alone cannot, as a matter of law, serve as the basis for concluding that an antitrust conspiracy exists.

In United Mine Workers of America v. Pennington the Supreme Court stated that a labor union, having concluded a wage agreement with one set of employers, may unilaterally seek to impose the same terms on other employers even though it is believed that "[s]ome employers cannot effectively compete if they are required to pay the wage scale demanded by the union." United Mine Workers of America v. Pennington, at 665, n. 2, 85 S.Ct. at 1591. It was also observed that "[s]uch union conduct is not alone sufficient evidence to maintain a union-employer conspiracy charge under the Sherman Act. There must be additional direct or indirect evidence of the conspiracy." United Mine Workers of America v. Pennington, *Id.* The textual material, not the language of the footnote quoted above, appears in Lewis v. Pennington and Ramsey v. United Mine Workers of America. Appellants' argument apparently relies upon the language quoted above from the Supreme Court's *Pennington* decision. They construe this language to mean that evidence of the effects and consequences of an alleged conspiracy, *e. g.*, statistics showing marginal producers are losing money and going out of business, reduction in the number of individuals employed as coal miners, et cetera, are insufficient to prove an antitrust conspiracy.

It cannot be said definitely that appellants' interpretation of the language in *Pennington* is either right or wrong. While this Court finds it difficult to construe that particular language in *Pennington* as appellants have, some support for appellants' interpretation of that language can be found in Mr. Justice Goldberg's dissenting opinion in *Pennington* appearing in Local Union No. 189, Amalgamated Meat Cutters & Butcher Workmen of North America v. Jewel Tea Company, Inc., 381 U.S. 676 at 714–715, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965). Even though the language in *Pennington* is not decisive, there is a logical basis for appellants' position. The "effects and consequences" theory is basically a causal argument. That is, a cause (the antitrust conspiracy) has produced certain results or effects (reduction in the number of people employed in the mines, financial losses by marginal producers, et cetera). This type of argument has one chief flaw: The difficulty in isolating a single factor causally responsible for identifiable effects. Often there are intervening and superseding causes which if shown destroy the validity of the argument. The "effects and consequences" theory appellants question appears to simply reverse the usually logical progression from cause to effect by first pointing to certain conditions and then concluding what caused these conditions. In any event, the problem of isolating a particular cause which definitely produced certain effects is still present. The law cannot be that an antitrust conspiracy can be proven by alleged effects and consequences of the conspiracy alone. If the only evidence a plaintiff could produce of an alleged antitrust conspiracy is statistics showing that they and other producers in an industry are losing money while some producers make money; that overall production in the industry is down while profits of certain companies are up; and that employment has dropped off in the industry, the defend-

ants should have a verdict directed for them at the close of plaintiff's case. Plaintiff would not even have made out a prima facie case for recovery.

Regardless of how accurate these statements might be, they do not apply under the facts of this case. Reviewing the record, it becomes obvious that contrary to appellants' contention South-East's case does not rest solely on alleged effects and consequences to prove the existence of the antitrust conspiracy. South-East presented evidence of statements made by UMW and Consolidation officials tending to show that there existed an implied or expressed agreement between the Union and Consolidation; there was evidence of past courses of dealing and performance between itself and Consolidation which were interrupted or changed as a result of Union activity; there was evidence concerning what happened at bargaining sessions between South-East and the Union which indicated that some agreement other than the National Agreement (the Bituminous Coal Wage Agreement) existed between the Union and certain producers.

While the question of the sufficiency of this evidence will be dealt with later, the importance of indicating that South-East introduced other evidence from which the existence of an agreement to restrain trade or competition could be inferred, is to show that it did not rely solely on alleged effects and consequences of the antitrust conspiracy to prove its claim. If the only evidence South-East introduced was the statistical evidence referred to earlier, then the case should never have been submitted to the jury. However, this was not the only proof they offered. Evidence of the type which appellants object to is admissible and can be considered by the jury in drawing its conclusion on the issue of liability if there is other evidence which supports the claim. See generally, Local 175 of the International Brotherhood of Electrical Workers v. United States, 219 F. 2d 431 (6th Cir. 1955); Standard Oil Company of California v. Moore, 251

F.2d 188 (9th Cir. 1957), cert. denied 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148. Therefore, while appellants' argument might be correct as far as it goes, it does not apply to the facts of this case.

B. Evidence and Statements which Allegedly Personalized South-East Claims Thereby Prejudicing Appellant

 Consolidation maintains they were prejudiced because certain evidence admitted and statements made at the trial tended to personalize South-East's claim, that is, gave the impression that it was the claim of the LaViers' family which controls and operates the company. It is contended that this left the jury with the idea that this was a David versus Goliath type controversy, with the LaViers family representing the small South-East Coal Company battling the combined giant forces of Consolidation Coal Company and the United Mine Workers of America. Thus, appellants argue that because of this characterization, the jury's sympathies had to lie with the underdog South-East Coal.

South-East Coal Company, for all intents and purposes, is a family-owned and family-run coal company. Mr. Harry LaViers, Senior, and his son, Harry LaViers, Junior, were the controlling forces behind South-East and made the decisions, either good or bad, for the company. The company, compared to Consolidation, is a small producer of coal and its actions are earmarked with the LaViers' name. While there was some personalization of the company's claim by occasional interchanging of the name plaintiff with Harry LaViers, Senior or Junior, this was no more excessive than might be expected under the circumstances. In addition appellants, partially as a result of the defense of in pari delicto, tended to contribute to any personalization which may have taken place.

Conceding that some personalization of South-East's claim did occur, it is still difficult to accept appellants' argument that this converted the dispute into a

small company versus large company controversy, or appellants' assumption that a jury's sympathies always rest with the underdog. Without some additional evidence that appellants were in fact prejudiced by these characterizations, the record does not support these assertions, and it is concluded that no injury resulted.

## C. Admissibility of Certain Hearsay Statements

During the trial, South-East introduced into evidence portions of answers made by the United Mine Workers to written interrogatories. The Union was asked to admit to the authenticity of certain speeches, editorials and statements made by Union officials which were appended to the Union's answers to the interrogatories, and then parts of these documents were read to the jury. Consolidation objected to and now challenges the admissibility of these statements on the grounds that they were hearsay as against them. (Consol's objection to the District Court's refusal to give its requested instruction on this matter was discussed earlier. See, I. Alleged Errors in Instructions: Section E. Instructions Respecting the Use to be Made by the Jury of Certain Hearsay Statements, supra, at p. 778). Consol's principal contention is that statements of this type are not to be admitted until "[t]here is independent evidence establishing, prima facie, that such others were members of the conspiracy." Standard Oil Company of California v. Moore, *supra.*

■ The general rule is that this type of evidence is admissible, however, subject to exclusion if no prima facie case of the existence of the conspiracy is established. The question of conditional admissibility is for the trial judge to determine. Carbo v. United States, 314 F.2d 718 (9th Cir. 1963). There is no error in conditionally admitting the statements before a prima facie case was established by independent evidence if subsequently such a case is proven, because the trial judge has wide discretion over the order of proof. Pennington v. United Mine Workers of America, 325 F.2d 804, 817 (6th Cir. 1963), reversed on other grounds, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). Flintkote Company v. Lysfjord, 246 F.2d 368, 378 (9th Cir. 1957), cert. denied, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46. At the close of plaintiff's case there had been established by independent or disassociated evidence a prima facie case, thus the requirement for having conditionally admitted the statements was met.

## D. Sufficiency of the Evidence

■ Appellants contend that the jury verdict, and the District Court's denial of their motions for directed verdict and judgment notwithstanding the verdict are in error, as the verdict "is not supported by clear evidence, but is contrary to undisputed facts and applicable legal principles." Appellants' argument with regard to the "clear proof" standard has already been discussed. See, I. Alleged Errors in Instructions, Section A. The Standard of Proof Required to Impose Liability, supra, at pp. 772–774. Furthermore, appellants' arguments on applicable legal principles have also been dealt with, See, I. Alleged Errors in Instructions, pp. 772–785, and what remains is the issue of sufficiency of the evidence.

In considering the sufficiency of the evidence, little if any advantage would be gained by an itemized review of plaintiff's case. Much of the evidence introduced at trial was similar to that used at the trials in Tennessee Consolidated Coal v. United Mine Workers and the retrial of the *Pennington* case in Lewis v. Pennington. Yet there was additional evidence introduced at the trial having particular significance to South-East's claim and which tended to emphasize that South-East's case was unique from either *Tennessee Consolidated Coal* or *Lewis.* (A single example is the evidence of the circumstances surounding the cancellation of the sales agency contract between Consolidation and South-East in which

Consol acted as sales agent for South-East's coal.) While some of the evidence introduced was circumstantial, which in and of itself might not support the jury's verdict, there was also direct evidence which, when coupled with the circumstantial evidence, raised plaintiff's case from one of mere suspicion or conjecture to a level where reasonable minds might have concluded liability upon the part of the appellants. After reviewing the record, it is concluded that there was substantial credible evidence to support the jury's verdict. The District Court's decision on this matter was correct and appellants' motions for directed verdict and judgment notwithstanding the verdict were properly denied.

## III. ALLEGED IRREGULARITIES WITH RESPECT TO THE JURY

### A. Mr. LaViers' Sr. Conversation with Two Jurymen

██ Consolidation contends that the District Court committed reversible error in not declaring a mistrial because of a conversation Mr. LaViers, Sr., of South-East Coal, had with two members of the jury outside of court during the trial. The conversation took place in a coffee shop in the hotel where some of the witnesses, jurors, attorneys and parties in the trial were staying. Mr. LaViers was seated by a waitress at a table which was situated next to another table where two jurors were eating breakfast. The District Judge, after examining Mr. LaViers,[16] found that appellants were not

16. The Court made the following examination of Mr. LaViers in ascertaining what took place in the coffee shop:

(Reporter's note:) "The following occurred at the bench in the immediate presence of counsel and the Court, and in the absence and out of the hearing of the jury:

"The Court: I want to clarify this other situation before we get into anything else. This is out of the presence or hearing of the jurors, at the bench, in connection with the statement made to the Court by Mr. Schmidt, counsel for the defendant Consolidation Coal Company with reference to two of the jurors, Mr. Hill and Mr. Osborne, who were seen in conversation with Mr. Harry LaViers, Sr., at the Coffee Shop of the Phoenix Hotel about 7:30 to 8:00 o'clock this morning, October 11, 1968.

"Now, then, do you want to make any further statement? I am just asking."

Off the record.

(Reporter's note:) "An off-the-record discussion took place at the bench.

"The Court: Come here, Mr. LaViers, please. Mr. LaViers, it has been reported to the Court that this morning in the Coffee Shop at the Phoenix Hotel, you, in the presence of Mr. Schmidt and Mr. Rowntree—

"Mr. Schmidt: Mr. Rowntree was not present.

"The Court: No.

"Mr. Rowntree: As I stated, I was there earlier.

"The Court: Yes. I don't know who else was there. But you were seated near or standing near or in the company—not

'in the company,' I don't want to use that term—but in contact with Mr. Hill and Mr. Osborne, who are members of the jury. Now, do you recall that incident?

"Mr. LaViers, Sr.: Yes, I do, Your Honor.

"The Court: Would you mind stating just what it was?

"Mr. LaViers, Sr.: Yes. Mr. Rowntree had gone down to breakfast prior to my coming down. When I came into the Coffee Shop, I looked for him and found that the table where he was seated only had one chair and I was looking around for some other table to sit at, and the head waitress came and said, 'Well, just sit down here'—which was right across the aisle from Mr. Rowntree—and I sat down on the bench and ordered my breakfast.

And Mr. Hill was sitting next to me, and he asked me, he said, 'Do you know Mr. Oscar Evans who lives in Paintsville?'

And I said, 'Well, he doesn't live in Paintsville now; he has gone to Florida —but I do know Mr. Evans.'

And he said, 'Well, I used to board at his house.'

And he said he was quite a character.

And I said, 'Yes, I agree with that,' and, 'I knew him very well.'

And then I believe that part of the breakfast, not the main part, was served, and Mr. Hill then asked me if I knew Mr. Nelson Howard who lived in Paintsville; and I said yes, 'I know Mr. Nelson Howard; he came from Gallatin County; he was in the automobile business there and later was in the coal busi-

prejudiced by this unintentional contact and declined to grant a mistrial.

Appellants maintain that the case of United States v. Harry Barfield Company, 359 F.2d 120 (5th Cir. 1966), controls, and a mistrial should have been granted on the basis of that authority. Reviewing the decision in United States v. Harry Barfield Company, it appears that several facts instrumental to that decision are lacking in the present case. In the *Barfield Company* case the prej-

udicial out-of-court conversation took place in an elevator between the president of the company and two jurors. The president of the company made an effort to approach the jurors and then "cemented" the contact by volunteering information that his wife and her family dealt with the drug store owned by one of the jurors. The Court observed:

"By way of summation it is clear that the taxpayer president approached the jurors. They did not approach

ness, I know him.' Mr. Hill said he used to work for him. I said, 'Well, he was quite an aggressive merchant when he was there, he made a lot of money and decided he would go into the farming business and bought a couple of farms down in Bourbon County, and I understand, lost what he had of his investment in these farms.'

I guess the rest of the breakfast was served about that time. I don't recall that there was—there was some gentleman came in on the other side, and they turned to him to speak to him. I don't recall any further conversation.

There was nothing about this lawsuit.

"The Court: Do you want to ask him a question?

"Mr. Schmidt: Mr. LaViers, there were other places to sit down in the Coffee Shop besides next to Mr. Hill and Mr. Osborne when you sat down? Isn't that true?

"Mr. LaViers, Sr.: Well, yes, sir, there are other tables for four and tables for two and the tables at the bench are for two, and the head waitress came along and tossed a menu down and just said, 'Sit down here,' and I sat where she put the menu. I didn't seek out this seat.

"Mr. Schmidt: You saw them sitting there?

"Mr. LaViers, Sr.: Oh, yes, I saw them sitting there.

"Mr. Schmidt: Was it in your mind that, even so, it wouldn't hurt to develop some sort of a social rapport with these gentlemen?

"Mr. LaViers, Sr.: No, Mr. Schmidt, that was not in my mind. I am by nature a person who talks to people in the elevator or wherever it might be, and I would be untruthful and unrealistic if I didn't say I do engage in conversations.

"The Court: How many minutes would you assume, or how much time, I should say, would you assume your conversation or what you stated to the Court, or any-

thing in addition to that, was consumed with either of these men?

"Mr. LaViers, Sr.: Oh, there were snatches of conversation, I imagine about ten or fifteen minutes. I was eating breakfast.

"The Court: That covered the whole period?

"Mr. LaViers, Sr.: Well, not the whole period of breakfast, but the period of the conversation.

"The Court: Do you want to ask him anything further?

"Mr. LaViers, Sr.: Mr. Rowntree has continuously cautioned me about this.

"The Court: Well, you see the point is, I mean, the Court accepts your statement that you didn't say anything about the case.

"Mr. LaViers, Sr.: We didn't talk anything about the case, Your Honor.

"The Court: But, you see, the difficulty is that this more or less currying of favor with a juror—while I realize it isn't currying a favor deliberately—but it has brought questions to people's minds. I realize some people are just naturally friendly, and Kentuckians are just that way—I know them pretty well—but we mustn't do anything like this.

"Mr. LaViers, Sr.: I would be very, very happy to avoid them.

"The Court: The Court is confident that you didn't do anything intentionally. That is the ruling of the Court.

Now, do you have anything you want to ask him?

"Mr. Rowntree: No.

"Mr. Schmidt: May I ask him a question?

"The Court: Yes, sir.

"Mr. Schmidt: Mr. LaViers, you have seen each of those gentlemen sit at the same table every morning?

"Mr. LaViers, Sr.: No, sir, they have not, as far as my knowledge, sat at that same table. They do sit in the Coffee Shop there at various places, but I don't recall seeing them at that particular place, Your Honor."

him. He sought to identify with juror Lockhart through the fact of knowing about his drug business. He then sought to cement the identity by giving the juror his wife's name which led to a conversation regarding his wife's family. He apparently also managed to find out that the juror from the radio station had known his brother."

(See the dissenting opinion by Judge Colman in the *Barfield Company* case, at p. 124, questioning the majority's characterization of these facts.)

In the present case Mr. LaViers was seated by a waitress next to the jurors. He did not seek them out. Furthermore, it was a juror who approached Mr. La-Viers with a question about whether he knew certain individuals. Obviously, Mr. LaViers could have simply ignored the juror, but the law does not require that when a person becomes a party in a lawsuit that he must renounce all social amenities and rudely ignore people who ask him questions. The juror's questions were answered by Mr. LaViers in a straight-forward polite fashion, without any attempt to ingratiate himself to the juror. There was no discussion of the case. The facts of *Barfield Company* which were of principal significance in that decision are lacking here and the case is clearly distinguishable from the present dispute. While, of course, these types of contacts must be scrupulously avoided if at all possible, the fact that in this case the contacts were brought about by a coincidence of circumstances, there was no intentional "seeking-out," and no discussion of the case occurred, the District Court's denial of the motion for a mistrial was proper and clearly not an abuse of discretion. United States v. Van Buskirk, 304 F.2d 871 (6th Cir. 1962).

**B. Alleged Error in the District Court's Refusal to Declare a Mistrial because of Certain Conduct of a Juror**

▮ Appellants contend that they were denied their constitutional right to trial by an impartial jury because the District Court refused to grant a mistrial upon learning of certain alleged misconduct of a juror. Two matters are alluded to as indicating that the partiality of one juror was questionable. First, an incident occurred during trial which allegedly was misconduct on the part of the juror. An attorney for the Union developed the following facts: the juror and his wife attended a social function in Lexington, Kentucky, during the trial. It appeared that the juror's wife was a sorority sister and close friend of the wife of a lawyer who practiced in the coal mining area of Eastern Kentucky. The juror was also a close friend of the lawyer. These people met at the social function, and the juror mentioned that a third lawyer who practiced in the same coal mining region was an attorney for the Union in the trial in which he was a juror and that this attorney was "a very able lawyer." Then the juror's wife made some comment about the present case being difficult "in following a conspiracy or in following just what they were driving at with all the reading and all." It was not at all clear whether the juror's wife mentioned the word "conspiracy" or not. On these facts a motion was made to subpoena the juror and the people involved in this incident and examine them. The District Court concluded that "nothing (had) been shown here to justify an investigation of this juror" and overruled the motion.

Appellant cites Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892), as controlling and requiring that under these circumstances an examination of the juror should have been granted. Under the facts in *Mattox*, it was obvious that an examination of the jurors should have taken place. In that case allegedly a court bailiff, present when the jury was deliberating the verdict in a murder case, stated, so that the members of the jury could hear him, that "this is the third fellow he (the accused) has killed." In addition, during deliberation the jury or part of it was read a

newspaper account of the trial that included the following remarks:

> "If he (the accused) is not found guilty of murder he will be a lucky man, for the evidence against him was very strong, or at least appeared to be to an outsider. The case was given to the jury at noon yesterday, and it was expected that their deliberations would not last an hour before they would return a verdict.

> \* \* \* \* \* \*

> "It (the evidence) was so strong that the friends of Mattox gave up all hope of any result but conviction."

Under these alleged circumstances, the court should have ordered an examination of the jury to determine the accuracy of the purported misconduct. However, by no stretch of the imagination can it be argued that the facts surrounding the present incident of alleged misconduct approximates those in *Mattox*. While questions of jury improprieties are matters of degree, it cannot be said that the District Court abused its discretion in not ordering an examination of the juror and the other participants in the present incident without further representation or a stronger indication that some misconduct prejudicial to appellants' constitutional right to an impartial trial did in fact occur.

■ The second matter that appellants point to which they contend shows partiality upon the part of this juror is that his insurance agency underwrote a real estate bond for the son of a former official of and present minor stockholder in South-East Coal Company. The juror was challenged for cause, but the District Court overruled the challenge. The examination of the juror showed that a $5,000 surety bond must be posted with the Commonwealth of Kentucky before a real estate broker can sell real estate. The juror's insurance agency underwrites the bond for the son of a former official and present minor stockholder in South-East Coal. The bond was first written several years before this litigation was commenced and simply has been renewed each year. Until informed, the juror did not know for a fact if he wrote the bond for the son or the father and, obviously, knew neither personally. Upon questioning, he stated that the fact he wrote the bond would not affect his judgment in any way. This case is distinguishable from Commonwealth Coatings Corporation v. Continental Casualty Company, 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968), cited by appellants to support their position that their challenge for cause of this juror should have been granted. In *Commonwealth Coatings* an individual acting as an arbitrator under a private contractual agreement had been an engineering consultant for one of the parties in the dispute and collected over $12,000 in fees in four years. The Supreme Court set aside an award made by the panel of three arbitrators holding that an arbitrator should disclose to the parties any dealings which might create an impression of possible bias. Factually and legally, the present case is different. Here a juror had only remote indirect contact with a party in a lawsuit. Even if the business contacts were more direct, all that *Commonwealth Coatings* requires is a disclosure of these dealings. In the present case, the nature and extent of the juror's business contacts were disclosed and the District Court, upon examination of the juror, concluded that he could impartially hear the evidence and return a verdict free of any prejudice that might result from his business dealings. The District Court's refusal to grant the challenge for cause of this juror was not an abuse of discretion. Holt v. United States, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910); Cox v. General Electric Company, 302 F.2d 389 (6th Cir. 1962).

## IV. DAMAGES

### A. The Jury Award of Damages

■ South-East sought damages allegedly resulting from the anti-competitive conspiracy in this case for a three and one half year period from April 26, 1962, to December 31, 1966. Two methods of computing these damages were

used to arrive at a dollar amount.[17] The first method was a simple comparison between operating profits and losses [18] during the period 1952–1958, an arbitrary base period, with the operating profit and losses for the period South-East sought recovery. A method similar to this was used in determining the antitrust damages in Bigelow v. RKO Radio Pictures, 327 U.S. 251, 258, 66 S.Ct. 574, 90 L.Ed. 652 (1946), and Ford Motor Company v. Webster's Auto Sales, Inc., 361 F.2d 874, 885–886 (1st Cir. 1966).

The second method was more complex and was designed to meet certain objections appellants had to the first method. This method used various financial and managerial figures for the years 1964 and 1965 for a comparison with similar figures in 1962, 1963 and 1966. Thus, statistics during the actual damages period (1964 and 1965) acted as a basis for computing damages for the entire period. Supporting this theory, South-East introduced six financial exhibits showing, in part: the effects higher mining costs and decreased production in 1962, 1963 and 1966 had on earnings compared to the base years 1964–1965; the effect on earnings of two strikes in 1962–1963 and 1966 as compared with earnings in 1964–1965; lower price realization on coal in 1964–1965 than in the remaining years of the damage period; and the alleged effect the conspiracy had on South-East's price realization per ton of coal compared with the average price realization of the industry for the period 1962–1965. South-East maintains that by using this approach appellant's challenge to the validity of using figures for 1952–1958 for the comparison, because allegedly during the damage period internal and external economic conditions were less favorable

than during 1952–1958, are effectively negated.

Appellants raise numerous issues regarding the validity of South-East's theories of damages. Mention of four of the challenges will give some idea of the general nature of appellants' attacks. Respecting South-East's first method of computing damages, appellants contend that using the profit average of 1952–1958 for the comparison is unfair as "internal and external economic factors," i.e. less favorable mining conditions and a general overall depression in the coal market, varied between the years used as a basis and the actual damages period. The second method is challenged on the grounds that use of new equipment during 1964 invalidates the comparison of the financial and managerial date with the base period 1962–1963. The third objection is that both methods claim losses for Consolidation's refusal to handle South-East's coal and that these losses cannot be recovered from the Union. Finally, appellants complain that South-East computed losses which were in part a result of its inability to get sufficient railroad cars to ship its coal and, therefore, were in no way attributable to the alleged conspiracy.

It appears that most of appellants' challenges to South-East's claims of damages are directed at the accuracy of the amount of damages and not the fact of damages. There was a general issue raised as to the lack of evidence showing that the proximate cause of South-East's damages was the conspiracy; that is, the sufficiency of evidence showing the fact of damages. However, reviewing the record, it is clear that there was sufficient credible evidence from which the jury was justified in inferring the necessary causal relation between the conspirators'

17. Computation of injuries by the first method produced a damages figure of $3,082,816. The damages figure produced by the second method was $2,896,713. The jury awarded damages of $2,410,452 or approximately $700,000 less than the damages computed by the first method and $500,000 less than computed by the second method.

18. Figures reflecting operating profit and losses rather than net income were used because these figures do not include such things as percentage depletion allowances which are treated as return of capital, interest payments (expenses) or income, capital gains and losses and dividend income.

anti-competitive conduct and the claimed damage or injury. Zenith Radio Corporation v. Hazeltine Research, 395 U.S. 100, 125, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). The antitrust cases are legion which reiterate the proposition that, if the fact of damages is proven, the actual computation of damages may suffer from minor imperfections. See, Story Parchment Company v. Paterson Parchment Paper Company, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931); Bigelow v. RKO Radio Pictures, *supra;* Zenith Radio Corporation v. Hazeltine Research, *supra;* Ford Motor Company v. Webster's Auto Sales, Inc., *supra;* Atlas Building Products Company v. Diamond Block & Gravel Company, 269 F.2d 950, 958 (10th Cir. 1959); North Texas Producers Association v. Young, 308 F.2d 235, 245 (5th Cir. 1962); Flintkote Company v. Lysfjord, 246 F.2d 368, 392 (9th Cir. 1957).

Appellants' principal grounds for objection to the jury verdict is that internal and external economic conditions and decisions of the management resulted in South-East's losses, and not the conduct of the alleged conspiracy. But the question of whether certain of South-East's losses were attributable to the conspiracy or other economic factors was for the jury's consideration and determination, Cherokee Laboratories, Inc. v. Rotary Drilling Services, Inc., 383 F.2d 97, 106 (5th Cir. 1967), cert. denied, 390 U.S. 904, 88 S.Ct. 816, 19 L.Ed.2d 870, as is the question of the credibility of the witnesses used in showing damages, Atlas Building Products Company v. Diamond Block & Gravel Company, *supra,* 269 F.2d at 959. It is concluded that there was sufficient credible evidence to support the jury's verdict as to the fact of damages and the amount of damages was computed as precisely as capable under the circumstances.

B. Attorneys' Fees

■ Appellants object to the award of attorneys' fees as unreasonable. A party seeking review of an award of attorneys' fees in an antitrust case has the burden of clearly demonstrating error in the factual basis of the award or an abuse of discretion. See, Armco Steel Corporation v. State of North Dakota, 376 F.2d 206, 213 (8th Cir. 1967); Twentieth Century Fox Film Corporation v. Goldwyn, 328 F.2d 190, 221 (9th Cir. 1964). In this case appellants have not shown either an error in the factual basis of the award or an abuse of discretion.

The judgment is affirmed.

PHILLIPS, Chief Judge (concurring).

I do not interpret the opinion in this case to conflict with the opinion of Judge Edwards, in which I concurred, in Ramsey v. United Mine Workers of America, 416 F.2d 655 (6th Cir.), cert. granted, 397 U.S. 1006, 90 S.Ct. 1238, 25 L.Ed.2d 419. I concur in the opinion prepared by Judge Brooks.